RALPH ALEXANDER v. STATE OF MARYLAND

[No. 1537, September Term, 1981.]

*Decided July 13, 1982.*

The cause was submitted on briefs to MOYLAN, MOORE and LOWE, JJ.

Submitted by *Thomas J. Bollinger, Assigned Public Defender,* and *Alan H. Murrell, Public Defender,* for appellant.

Submitted by *Ann E. Singleton, Assistant Attorney General, Stephen H. Sachs, Attorney General, William A.*

*Note: *Certiorari* granted, Court of Appeals of Maryland, October 29, 1982.

*Swisher, State's Attorney for Baltimore City,* and *Gary Ticknor, Assistant State's Attorney for Baltimore City,* for appellee.

Lowe, J., delivered the opinion of the Court.

—a legal prologue—

In the decade that commenced with the assassination of President Kennedy, climaxed with the creation of this Court, and concluded with the marriage of Tiny Tim, violence proliferated, partly because police were constitutionally hobbled in controlling a rebellious reaction and partly because citizens were reluctant — or afraid — to become "involved" in deterring that violence. This reticence seemed to emanate less from fear of physical harm than from the potential consequences of a legal aftermath. Representative was the 1964 New York homicide of Catherine "Kitty" Genovese, who was viciously ravaged and repeatedly stabbed while onlookers turned their backs to avoid witnessing the butchery, and neighbors closed their doors and windows to shut out her screams of anguish until her suffering was finally ended by the murderer. Witnesses who were interviewed excused their indifference by noting that the law did not protect a protector from criminal assault charges if the one he aids was initially in the wrong, however misleading appearances may have been. *See People v. Young,* 11 N.Y.2d 274 (1962). The onlookers hesitated to become involved in the fracas at their legal peril. Even if their hearts had been stout enough to enter the fray in defense of a stranger being violently assaulted, the fear of legal consequences chilled their better instincts.

At common law, the privilege of using force for crime prevention did not include authority for intervenors to protect third persons who were strangers to the intervenor. The privilege, even now in some jurisdictions, was limited to the protection of those closely related to, or associated with, the intervenor. *See Guerriero v. State,* 213 Md. 545 (1957). That restriction to family or close associates was imposed because

the right evolved not from the right of self-defense, as most cases imply, but from the right to protect one's property. R. Perkins, *Criminal Law* (2nd ed. 1969) at 1018-1019. III W. Blackstone, *Commentaries on the Law of England* 3 (facsimile ed. 1979), described the right as only Blackstone could:

> "In these cases, if the party himself, or any of these his relations, be forceably attacked on his person or property, it is lawful for him to repel force by force; and the breach of the peace which happens is chargeable upon him only who began the affray."

Although it was merely a defense, an excuse for breach of the peace (or even homicide), Blackstone put great emphasis upon the natural source of this legal right. He felt that it

> "is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society." *Id.* at 4.

Perhaps because the right to protect one's "property" (*i.e.,* his household, which included wife, children, servants, etc.) carried the same limitations upon the degree of force employed as did self-defense,[1] many, if not most, of the courts in this country addressed the issue from the view that no force could be justifiably employed unless the protected person may have justifiably defended himself. That generally was the law espoused by the leading New York case of *Young, supra,* where the court affirmed the conviction for assault of a defendant who, in good faith, intervened in a struggle between a plain clothes police officer and a person whose arrest the police officer was attempting to effect.

The Maryland Court of Appeals has never directly addressed the issue, but inclined with the majority by strong

---

1. ". . . but care must be taken, that the resistance does not exceed the bounds of mere defense and prevention; for then the defender would himself become an aggressor." Blackstone, *supra* at 4.

dicta in 1957. In *Guerriero v. State, supra* at 549, the Court acknowledged, if somewhat grudgingly, that:

> "A third person, closely related to or associated with one attacked in such a manner that he could properly have defended himself by the use of force, has a right to go to the defense of the person attacked and to use the same degree and character of force that the one attacked could have used."

The care with which the Court chose to refrain from espousing any law beyond the narrow confines of the facts of that case is emphasized by the next sentence, in which the court hesitated to concede that a brother was a sufficiently close relative to warrant a right to that defense.

> "The cases differ as to whether, and under what circumstances, one may so defend a brother in danger but we assume, without deciding, that he may, since the State concedes the point."

Early in this Court's judicial life, it carefully adhered to that narrow and restricted espousal of the right to aid third persons, limiting the beneficiaries of such right to relatives or close associates of the intervenor, but more significantly for our present purposes, by restricting the right to

> "such a manner that he [the victim] could properly have defended himself by the use of force ...."
> *Tipton v. State,* 1 Md. App. 556, 560 (1967).

Although the reciprocal right limitation was not clearly or definitively expressed in either *Guerriero* or *Tipton,* both cases showed Maryland leaning toward the New York view that one goes to the aid of another at his peril, and his protection from criminal charges depends not on what appears to him when he intervenes, but rather upon the rights of the person whom he has succored. As Perkins, *supra,* points out,

> "it has been common but quite unfortunate to say that the defender 'stands in the shoes' of the one

defended with exactly the same privilege or lack of privilege as possessed by the latter." *Id.* at 1020.

Perkins finds fault with that theory because it forces a Good Samaritan to gamble not only his health but his freedom and reputation, and overlooks the likelihood that the intervenor might have acted entirely without mens rea, and perhaps even with the highest sense of duty. It deals with such a defender as the willing participant in a brawl; whereas, from his standpoint (with the facts as they reasonably appear to him), he may be seeking to defend an innocent victim from a felonious assault.

Perkins' preferred position better fulfills our contemporary social needs by merging the encouragement of crime prevention with the privilege of defending others. It was approved instinctively by this Court in *Gray v. State,* 6 Md. App. 677, 685-686 (1969), without mentioning *Guerriero, Tipton* or even *Young. Gray*'s failure to address those older cases or the common law cases might have been justified because Maryland abrogated its common law status in that regard in 1965 by broadly extending the right to intervene to aid an apparent victim of a violent assault. Md. Ann. Code (1982 Repl. Vol.), Art. 27, § 12A, provided that:

> "Any person witnessing a violent assault upon the person of another *may lawfully aid the person being assaulted* by assisting in that person's defense. The force exerted upon the attacker or attackers by the person witnessing the assault may be that degree of force which the assaulted person is allowed to assert in defending himself." (Emphasis added).

But in *Gray* we didn't mention the statute either.

*Gray* dealt with a son who killed his father, allegedly to protect his mother. That relationship had no need to look beyond the common law; however, we held that an "acting on appearances" instruction was properly denied, but only because the issue had already been fully instructed. The

request was cumulative, we said, because the court had instructed that in order to qualify or excuse the killing, the defendant had to have believed at the time that a person close to him (his mother) was in danger of losing her life or suffering serious bodily harm, and that the circumstances were such as "to warrant reasonable grounds for such belief in a mind of ordinary reason." *Id.* at 685. The trial judge supplemented the instruction by adding that the test was not what the jury thought a reasonable man would believe,

> but rather what the defendant, as a reasonable man, believed, to be taken into consideration." *Id.* at 685-686.

Clearly acknowledging the legal propriety of the instruction, Judge Morton said for this Court that:

> "Under the circumstances, we are of the opinion that the jury was fairly apprised of the law relating to a homicide committed in defense of a close relative and, accordingly, find no prejudicial error by the trial court in refusing to grant the instruction as submitted." *Id.* at 686.

While this holding clearly indicated a first impression in Maryland on the question of an accused's state of mind, we cannot say that it expressed the legislative intent of Art. 27, § 12A — because, as noted, the statute was not mentioned in the opinion. Indeed, the only direct reference to that statute which we are able to find in any reported opinion appears in *Pope v. State,* 284 Md. 309, 325 (1979), where Judge Orth acknowledged the Act as one of two "Good Samaritan" statutes [2] enacted by the General Assembly and described its purpose as intending to "afford protection to one who assists another in certain circumstances." That is not only its obvious raison d'etre, but no other reason for its being is conceivable.

---

2. Section 12A is a criminal counterpart to Art. 43, § 132, which grants civil immunity to certain persons rendering medical aid under emergency conditions and which was also intended to afford protection to one who assists others in distress.

When House Bill 139 (which became § 12A) was sponsored in 1965, it arose in the wake of the Genovese and other similar causes celebres publicizing the legal dangers of "involvement." As indicated by *Pope,* the Act was clearly intended to encourage and to afford protection to "good samaritans" by removing their legal doubts, which might impede crime prevention and deter those who witness violent assaults upon persons, but who otherwise would aid an apparent victim of criminal violence. Even in the days of Blackstone, such need was recognized to supplement the slowly grinding vehicles of justice, and that need has increased apace with the contemporary increase in violent crime. Blackstone pointed out that

> ". . . the law, in this case, respects the passions of the human mind; and (when external violence is offered . . .), makes it lawful in him to do himself that immediate justice, to which he is prompted by nature, and which no prudential motives are strong enough to restrain. It considers that the future process of law is by no means an adequate remedy for injuries accompanied with force; since it is impossible to say to what wanton lengths of rapine or cruelty outrages of this sort might be carried unless it were permitted a man immediately to oppose one violence with another." Blackstone, *supra* at 3-4.

Maryland thus appears to have been in the forefront in safeguarding the right which Blackstone recognized as a legal adjunct of natural instincts, and in adopting what Perkins recommends as the more "enlightened view."

> "Subject to the familiar limitations as to the degree of force permitted, one who is himself free from fault may intervene and use force to protect an innocent victim of intended crime. And under the sound view he is protected by the usual mistake-of-fact doctrine and may act upon the situation as it reasonably seems to be." Perkins, *supra* at 1021.

178

The clear and unambiguous language of the statute is that the *witnessing* of the violent assault is that which affords protection for the intervenor. There is no reference at all in the Act indicating as a prerequisite to legal absolution that the apparent *victim* be faultless. To interpret the statute as limited by the common law restrictions would eliminate any purpose for its enactment.

—the factual setting—

The appellant, Ralph Alexander, a prisoner in the Maryland Penitentiary, was convicted by a jury in the Criminal Court of Baltimore (along with Bruce Shreeves, a fellow prisoner), of an assault on a correctional officer, Dale Tscheulin. As might be expected, the witnesses for the State and those for the defense saw the same scene from divergent points of view. The State's witnesses contended that Officer Tscheulin was attacked by Shreeves, who was subsequently assisted in assaulting the officer by appellant Alexander. Appellant Alexander and his witnesses alleged that another officer, Samuel Stokes, Jr., had apparently grabbed prisoner Shreeves from behind, without provocation, and then Officer Tscheulin came to the scene and started hitting Shreeves. Although Shreeves implicitly acknowledged his initial aggression, he contended that Alexander had seen only the violent overreactions by the guards, and that Alexander's actions were therefore appropriate according to his limited view of the situation.

When Alexander approached Tscheulin to state that he didn't have to "beat on" Shreeves as he was doing (according to Alexander), Tscheulin turned around and struck him. Alexander stated that he then simply grabbed the bars and pinned Tscheulin between himself and the bars, but did not strike him; whereupon, he returned to his cell. The State's version did not vary substantially except as to the degree of force used by Alexander. Tscheulin and Stokes agreed that they were subduing Shreeves, who had approached them with a fighting pose on the catwalk of the third tier when the

prisoners were ordered to "lock in" after exercise period. Alexander rushed upon the scene, leapt on Tscheulin, who was preoccupied with Shreeves, and struck the officer in the chest and head.

The issue here is not which version to believe, for that, of course, is the role of the factfinder. The issue is whether the trial court erred when it instructed the jury in regard to the law applicable to the defense theory that appellant intervened to aid the apparent victim of an assault. The judge instructed the jurors on defendant Shreeves' right of self-defense as well as appellant's right of self-defense, if they chose to believe that right was raised by the facts or inferences available from the evidence. He then added:

"Now, as to the defendant Alexander there is an additional factor you have to consider. He has a right to go to the defense of Mr. Shreeves to the same extent that Mr. Shreeves has a right to defend himself. The defendant Alexander's right of self-defense is the same as that of the defendant Shreeves but no more, no less. In other words, if Shreeves had the right to defend himself, then Alexander had the right to go help him defend himself; if Shreeves did not have the right to defend himself, then Alexander didn't have the right to go help Shreeves defend himself. He stands in the same shoes as Shreeves when he elects to come to his assistance.

Now, if you find that the defendant Shreeves is not guilty because he had a right of self-defense, then you must also find the defendant Alexander not guilty because he would have that same right of self-defense regarding Shreeves, but if you find that the defendant Shreeves did not have the right of self-defense, then it necessarily follows that the defendant Alexander cannot claim that right of self-defense on the basis that he was trying to protect the defendant Shreeves."

The appellant objected timely, arguing that Alexander's right to intervene was not tied to the actual propriety of Shreeves' conduct, but rather depended upon what the jury believed Alexander's conduct was intended to do.

"MR. LEVIN [Defense Counsel]: Yes, Your Honor. As to the instruction on self-defense, I think it would have to be clarified that if the jury wanted to believe the testimony put on by the defense that he was merely holding, mere holding against the bars may not constitute an assault if believed the reason why he is doing it is to stop a fracas, and I guess part and parcel of that is the jurors should be told that even though Shreeves might not have the right of self-defense, the jury should judge Alexander's actions on the standard of what Alexander saw when he appeared on the scene."

The State's brief points out correctly that the case relied upon by appellant, *Gunther v. State,* 228 Md. 404 (1962), is inapposite because it applies only to self-defense — rather than to defense of another. It argues that:

"Instructions given by the trial court in the instant case were substantially in compliance with the instruction on self-defense and defense of others approved in the *Maryland Criminal Jury Instructions and Commentary.*[3] Moreover, the instructions given by the trial court were in conformity with Maryland case law on the defense of another. A third person, closely related to or associated with one attacked in such a manner that he could properly have defended himself by the use of force, has a right to go to the defense of the person attacked and to use the same degree and character

---

3. Aaronson's *Maryland Criminal Jury Instructions and Commentary,* relied upon by the State as having approved instructions similar to those given by the trial judge, is neither authority to instruct us, nor sufficiently accurate to persuade us. It was published a decade after the enactment of Md. Code, Art. 27, § 12A, by the same publisher as the Maryland Code, but nowhere does it recognize or comment upon that statute.

of force that the one attacked could have used. *Guerriero v. State,* 213 Md. 545, 549, 132 A.2d 466 (1957); *Tipton v. State,* 1 Md. App. 556, 560, 562, 232 A.2d 289 (1967)." (Footnote omitted).

But as is apparent from our prologue, appellee has relied upon the common law as it *may* have existed in 1957. The statute enacted by the Legislature in 1965 dealing with unrelated third persons aiding those under assault was not considered by the parties or the court below, or the parties on appeal. Under the facts of this case, however, the statute is particularly apposite if peculiarly not noted by anyone; yet the failure to discover the statute is easily explained, if not justified. The index of the Maryland Code, to speak charitably, leaves something to be desired.

Contextually we doubt that the Legislature gave any thought to the application of § 12A in a circumstance behind prison walls. But laws in this "nation of laws" must apply to all persons equally. The facts and circumstances, and even the "prison atmosphere" may, however, give rise to inferences which change or even nullify the applicability or the effect of laws. A fact finder here, for instance, may, in light of the structured setting, consider whether Alexander was witnessing two guards properly subduing a recalcitrant prisoner in a segregation area when he leapt at an opportunity to release his pent-up frustrations on a guard, as was argued by the State at trial —

> "You've got officers, you've got something going on down here, some people say it was a fight, but you've got another situation going on down there, an excellent opportunity to give a little bit and maybe get away without anybody seeing you. The *frustration factor*" —

or whether Alexander saw two overzealous guards violently assaulting a fellow prisoner, and intervened, as he contended, to prevent injury to his fellow inmate and avoid the type of explosive incident so likely to arise in that volatile punitive segregation section of the penitentiary.

That was the theory that appellant tried to convey and that which his codefendant sought to put across in proper person on his behalf.

Shreeves (who had chosen to represent himself) argued more eloquently for appellant Alexander than for himself, and pointed up how the same circumstances are affected by the setting in which they take place. Addressing the jury, he set out poignantly and succinctly the essence of appellant's defense, which also vividly makes our point that "circumstances alter cases," and it is the jury that judges the circumstances. Mr. Shreeves said:

> "Ladies and gentlemen of the jury, when I first started, when I asked for a jury trial, I thought that if I would come in and be honest with my testimony, regardless of how it went, and try to convey to you the experience, some of the experience of being in the Penitentiary, that, you know, everything would be all right, but I have found circumstances during the trial that it's hard for one to convey to you, ladies and gentlemen of the jury, how it is in the Penitentiary experiences one has to experience themselves to really understand. In essence, we live in two different realities for the simple fact when you judge, or when you look upon the facts of what transpired, what went down, you don't have the essence of the motivations, the personalities, the conditions that one finds himself under, how he must respond to this. It is really chaos, and when the District Attorney or a lawyer represents one of us, they cannot convey the deeper meanings of being there, the experience itself. They deal with law, and law is cold, there's no question, because it leaves out the human element.

> We have, most of us have broke our social contracts and find ourselves in a condition that is alien. That's what it is, and one must adapt to it, and by adapting to this experience you lose a lot, you lose sensitivity, you lose honesty, you lose trust.

You become — You're living off of almost instinct, because if you say the wrong things at the wrong time, or if you don't say the right things at the right time you can find yourself in trouble, serious trouble.

Now, I, myself, I must accept my fate, but if Ralph Alexander had been in another reality and come to the aid, did not so much come to my aid in this but the aid of a free participant, because if he hadn't interjected and held Tscheulin and give us time to get ourselves in order and cool down, the situation could have been far worse than what it was, and that's what must be in your minds when you go in the jury room. For him, you know, I ask you to find in your hearts to try to do something for him. For myself I cannot ask that, you know. I know the reality. I've been there long enough to know and, even now, I can't find the words to try to convey to you the seriousness of the Penitentiary.

I thank you. That's the best I can do."

In light of appellant's singular defense and his counsel's pointed objection to the instructions, we believe the court erred in not correcting its instruction, which linked Alexander's fate to Shreeves' culpability. An intervenor's right to react is not strictly coterminous with a participant's right to self-defense. Under the court's instruction, Shreeves' admissions sealed Alexander's fate regardless of Alexander's view of the situation.

Under the statute, however, Alexander must be judged on his own conduct, based upon his own observation of the circumstances as they reasonably appeared to him. The reasonableness of his perceptions and the bona fides of his reactions are key elements of consideration by the factfinder, who must review the totality of the circumstances in their setting. Whether it is reasonable for a fellow prisoner to have perceived that two guards subduing a prisoner on a catwalk of a maximum security prison are violently assaulting him, may be contrasted, for example, with the

reasonableness of a priest's perceptions of two men similarly "subduing" a nun in an isolated area of a darkened cemetery. Even assuming that both priest and prisoner "reasonably" perceived a violent assault, still it must be decided whether the reaction to intervene was a *bona fide* attempt to aid the person being assaulted. Even an intent to punish the offender or to avenge his victim will not suffice. The purpose of the intervention must have been "to aid" the victim, or the statutory absolution is lost.

Whatever the law may have been in Maryland prior to 1965, it is clear that the Legislature, motivated by increasing violence in society and the reluctance of citizens to "get involved," sought to afford protection to a defender who acts while injury may still be prevented, rather than awaiting judicial reprisals which are geared to provide punishment after the damage has been done. The probability of that having been appellant's motivation in this prison setting, however, remains a jury question under the proper instructions.

—subsequent assault as reflecting upon credibility—

Our reversal of the judgment of the Criminal Court of Baltimore resolves two other issues raised by appellant, his right to be present at a critical stage of the trial and his effort to obtain a severance of trial from his codefendant, who fought so valiantly on appellant's behalf. One issue, however, should be addressed for the guidance of the court on retrial.

Appellant sought to cross-examine the prosecuting witnesses on an incident that occurred immediately after the conclusion of the alleged assault in this case. Appellant proffered that, moments later, Officers Tscheulin and Stokes returned along with a number of other guards, took appellant to the shower, then stripped and "beat the hell out of him."

Appellant proffered this as an attack on the "credibility" of the two prosecuting witnesses. The trial judge did not

permit cross-examination and we cannot say that such declination was an abuse of discretion. Assuming the truth of the allegation, for purposes of this determination, it was, at most, an accusation as opposed to a conviction, *see Neam v. State,* 14 Md. App. 180, 188 (1972), of a subsequent bad act. It had no relevance whatsoever to the actors' propensities for truth or falsity. *See Thomas v. State,* 32 Md. App. 465, 475 (1976). The witnesses' motives of revenge or punishment relate not one whit to whether the accused was an aggressor or a protected intervenor in the prior altercation and, if admitted, would have constituted a diversion from issues before the jury. *See McLaughlin v. State,* 3 Md. App. 515, 524-525 (1968). If true, it is a penal circumstance that should be corrected within the system, but this trial is not the appropriate forum for its investigation or exposition.

> *Judgment reversed; case remanded for retrial.*
> *Costs to be paid by Mayor and City Council of Baltimore.*