John Madison HUGHES, Appellant,

v.

The STATE of Texas, Appellee.

No. 631–85.

Court of Criminal Appeals of Texas, En Banc.

Sept. 17, 1986.

James A. Morris, Orange, for appellant.

Herbert B. Hancock, Dist. Atty. and Martha J. Sullivan, Asst. Dist. Atty., Nacogdoches, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Indicted for murder, appellant was convicted by a jury of the lesser offense of voluntary manslaughter and his punishment assessed at twenty years confinement and a fine of $10,000.00. On appeal the Tyler Court of Appeals reversed appellant's conviction, holding that the trial court erred in charging, as part of its instruction to the jury on the law of defense of third parties, both in the abstract and in application to the facts of the case, that before appellant was entitled to use deadly force in defense of a third person it must be found that a reasonable person in his position would not have retreated under the circumstances. *Hughes v. State,* 721 S.W.2d 356 (Tex.App.—Tyler, 1985). We granted the State's petition for discretionary review to examine the State's contention that in so ruling the court of appeals appears to have misconstrued V.T.C.A. Penal Code, §§ 9.33 and 9.32. Tex.Cr.App. Rule 302(c)(4), now Tex.R.App.Pro. Rule 200(c)(4).

I.

The killing occurred on the shoulder of Farm to Market Road 138 in Nacogdoches County on January 28, 1982. Two passersby testified for the State that on that afternoon they saw a Thunderbird and a Chevrolet pickup parked along the roadside. In the driver's seat of the pickup was the deceased, Rodney Johnson, and standing beside the driver's door talking to him was Joan Goodwin. Appellant was observed leaning on the hood of the truck. Both witnesses momentarily looked away, and then, looking back, observed appellant withdrawing his upper body from the driver's window. Smoke was seen coming from the cab of the pickup, and one of the witnesses saw a pistol in appellant's hand. Appellant and Goodwin fled in the Thunderbird. When the witnesses reached Johnson's pickup, they found him on the floorboard, shot to death. Also found on the front seat was a longbarrel .22 pistol, loaded but unfired.

Goodwin took the stand on behalf of appellant. She testified that Johnson had long been her friend, but that they had never been romantically involved. Nevertheless Johnson was upset that Goodwin was "seeing" appellant and asserted to her on one occasion, "If I have to kill you to get to him I will do that."

Other defensive testimony showed that appellant and Goodwin had been to a party at the home of Mary Hodge on an evening earlier in January. When Johnson arrived at the party appellant rose to shake his hand, but Johnson cursed him and struck at him, precipitating a scuffle. Appellant drew a pistol but did not actually point it at Johnson, merely stating that this time he had the gun, and thus the upper hand, or words to that effect. Death threats were exchanged, but the altercation ended when Hodge ordered Johnson out of the house.

Defense witnesses testified that on the day of the killing Hodge was driving Goodwin and appellant to her house when Johnson passed them in his pickup. When

Johnson turned around and began to follow them, Hodge pulled over to the side of the road. Johnson pulled up about two car lengths behind, and Goodwin and appellant got out of the Thunderbird to talk to him, while Hodge stayed in the car. It was approximately 3:00 p.m., and Goodwin and appellant had been drinking throughout the day.

According to Goodwin, the following transpired:

Q   Did anyone else get out after you got out?

A   John.   He was behind me and I walked up there.

Q   You walked up where, ma'am?

A   To Rodney's pickup.

Q   Okay.

A   And John was right behind me.   And Rodney—

Q   What happened then?

A   Rodney said, "I don't have anything to say to you motherfucker I just want to talk to Joan."   Okay—

Q   What at that point did John do if anything?

A   He turned around and went back to the front of the pickup and just leaned up against the front of the pickup.

Q   Okay.   What happened then?

A   I said, "Rodney, I don't understand why you're acting like this."   I said, "If you're going to be like this we can't even be friends".   [sic]   And he grabbed me, Rodney grabbed me.   And when he did I just—I pulled back from him and you know, just pulled my arms back from when he grabbed me and I said, "hey, what are you doing".   [sic]   And I looked back up in there, you know, and by the time I looked back up in there he's got a gun in his hand and I said, "he's got a gun".   [sic]   And that's when John turned around and shot him.

Q   Did Rodney say anything prior to reaching for the gun?

A   He said, "I told you if I had to kill you to get to him I would do it."

*       *       *       *       *       *

Q   One last question, ma'am.   Did Rodney Johnson threaten to kill you and John Hughes just before John Hughes shot him?

A   Yes.

The trial court charged the jury on the law of selfdefense and the law of defense of a third party.   As to defense of a third party the court's instructions read:

A person is justified in using deadly force against another when and to the degree he reasonably believes such force is necessary to protect a third person if, under the circumstances as he reasonably believes them to be, he believes such force and degree of force would be immediately necessary to protect himself against the unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect, *if a reasonable person in his situation would not have retreated,* and he reasonably believes that his intervention is immediately necessary to protect the third person.

*       *       *       *       *       *

Therefore, even if you believe from the evidence beyond a reasonable doubt that the Defendant, John Madison Hughes, shot Rodney Lamar Johnson, as alleged, but you further believe, or if you have a reasonable doubt thereof, that, at the time he did so, the Defendant reasonably believed Rodney Lamar Johnson was threatening Joan Goodwin with unlawful deadly force and the Defendant reasonably believed the use of deadly force and the degree of deadly force used against Rodney Lamar Johnson would be immediately necessary to protect Joan Goodwin against such unlawful deadly force that he reasonably believed to be threatening Joan Goodwin, *and that a reasonable person in the Defendant's situation would not have retreated,* and that the Defendant reasonably believed that his intervention was immediately necessary to protect Joan Goodwin, you will find the Defendant not guilty.

However, if you believe from the evidence beyond a reasonable doubt that, at

the time and place in question, the Defendant did not reasonably believe Rodney Lamar Johnson was threatening Joan Goodwin with unlawful deadly force, or that the Defendant did not reasonably believe the use of deadly force and the degree of deadly force used against Rodney Lamar Johnson would have been immediately necessary to protect Joan Goodwin against such unlawful deadly force that he reasonably believed to be threatening Joan Goodwin, *or that a reasonable person in the Defendant's situation would have retreated,* or that the Defendant did not reasonably believe that his intervention was immediately necessary to protect Joan Goodwin, you will find against the Defendant on this plea of justification.[1]

Relying on *Crawford v. State,* 629 S.W.2d 165 (Tex.App.—Waco 1982, no pet.), the court of appeals held that §§ 9.33 and 9.32, supra, do not create a duty to retreat before an accused may use deadly force in defense of a third party, and sustained appellant's ground of error attacking the foregoing charge.

### II.

The requirement that an accused have made a reasonable retreat before resorting to the use of deadly force in defense of *himself,* though found in the common law of England, was not recognized in the statutes and decisional law of Texas prior to enactment of the 1974 Penal Code. *Cooper v. State,* 49 Tex.Cr.R. 28, 89 S.W. 1068 (1905); Article 1225, V.A.P.C. (1925). See *Sternlight v. State,* 540 S.W.2d 704 (Tex. Cr.App.1976); Practice Commentary, V.T. C.A. Penal Code, § 9.32. Now, however, that requirement is expressly provided in § 9.32, supra, which reads:

A person is justified in using deadly force against another:

(1) if he would be justified in using force against the other under Section 9.31 of this code;

(2) *if a reasonable person in the actor's situation would not have retreated;* and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force ...

The State here argues, as it did in the court of appeals, that V.T.C.A. Penal Code, § 9.33(1) incorporates the necessity to retreat if reasonable into the law of defense of third parties by virtue of its reference back to § 9.32(2), supra. Section 9.33, supra, reads:

A person is justified in using force or deadly force against another to protect a third person if:

(1) under the circumstances as the actor reasonably believes them to be, *the actor would be justified under Section* 9.31 or *9.32 of this code in using force or deadly force to protect himself against the* unlawful force or *unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect;* and

(2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

The court of appeals reasoned that to construe § 9.33, supra, to require the accused to retreat if reasonable before coming to the aid of a third person whose safety he reasonably believes his intervention is immediately necessary to protect would countermand the obvious legislative intent in enacting the justification in the first place. The State Prosecuting Attorney now asserts that while the court of appeals may have correctly perceived the legislative intent, nevertheless the plain wording of § 9.33, supra, in its reference back to § 9.32, "requires retreat before defending another." It is suggested that we uphold the instruction given in the instant case, and leave it to the Legislature to revise the provision to reflect its true purpose.

---

**1.** All emphasis supplied unless otherwise indi-    cated.

In our view, however, the legislative intent as perceived by the court of appeals is reflected unambiguously in the plain wording of § 9.33, supra.

## III.

Because under § 9.33(2), supra, an accused must reasonably believe that his intervention is *"immediately* necessary to protect the third person," it would be paradoxical, to say the least, to suggest that the Legislature intended that he first be required to retreat. Clearly what the legislature *did* intend was to justify use of deadly force to protect a third person in any situation in which the third person would apparently be justified in using deadly force to protect *himself.* By positing in § 9.33(1) that "the actor would be justified under Section ... 9.32 of this code" in using deadly force to protect *himself* against that force "he reasonably believes to be threatening the third person he seeks to protect," the Legislature was merely placing the accused, who is the "actor" under § 9.33, supra, in the shoes of the third person. So long as the accused reasonably believes that the third person would be justified in using deadly force to protect himself, the accused may step in and exercise deadly force on behalf of that person. Part of what goes into the assessment of whether the third person had a right to exercise deadly force in defense of himself is whether or not a reasonable person in his position would have retreated instead. Thus, in deciding intervention is necessary, the accused must reasonably believe that "a reasonable person in [the third person's] situation would *not* have retreated."

The jury would correctly be instructed, then, that to find the conduct of the accused to have been justified as defense of a third person, *inter alia,* it must believe, or have a reasonable doubt whether the accused, from his standpoint, reasonably believed that a reasonable person in the third person's situation would not have retreated.[2]

Not only does this construction follow from the plain wording of § 9.33(1), supra, it also comports with principles of statutory interpretation enunciated in the Code Construction Act. Tex.Gov.Code Ann., § 311.023 provides:

> In construing a statute, *whether or not the statute is considered ambiguous on its face,* a court may consider among other matters the:
>
> (1) object sought to be obtained;
>
> \* \* \* \* \* \*
>
> (4) common law or former statutory provisions, including laws on the same or similar subjects;
>
> (5) consequences of a particular construction ...

Quite obviously, the objective of the Legislature in enacting § 9.33, supra, was to justify the conduct of one who goes to the aid of a fellow he reasonably believes to be under attack with unlawful deadly force. As observed by the court of appeals, the consequences of adopting the State's suggested construction of § 9.33, supra, would be to "annul" that obvious purpose by requiring the accused to abstain from his samaritan impulse so long as he can reasonably do so without injury to himself. In fact, if the State's were a correct reading of § 9.33's reference back to § 9.32, then it would also follow that one who acts in defense of a third person would *himself* have to be threatened with unlawful deadly force, via § 9.32(3)(A), supra, before he could in turn use deadly force in defense of the third person also so threatened! Such a construction would indeed nullify the legislative objective behind enactment of § 9.33, supra.[3]

---

**2.** Since the jury must assess the circumstances from the standpoint of the accused, so long as it is found that it reasonably appeared to *him* that a reasonable person in the third person's position would not have retreated before using deadly force, he would be entitled to an acquit- tal, even if the jury also believed, incidentally, that in reality a reasonable person in the third person's position *would* have retreated before resorting to deadly force.

**3.** The dissent would construe § 9.33(1), supra to require that "where the circumstances raise the

Considering prior law, it has long been held that in the context of charging on the defense of third parties, the law of retreat, if applicable at all, would only apply to the third party. See *Mathews v. State*, 114 Tex.Cr.R. 526, 26 S.W.2d 269, 270 (1930); *White v. State*, 88 Tex.Cr.R. 159, 225 S.W. 511, 513 (1920); *Dobbs v. State*, 51 Tex. Cr.R. 113, 100 S.W. 946, 949 (1907). As noted *ante*, at the time these cases were decided the law provided that an accused did *not* have to retreat before acting in selfdefense. Nevertheless these cases support the proposition that whatever the law may be regarding retreat, i.e., whether one acting in his *own* defense must retreat or not, that law does not apply to an accused who acted in defense of a third person. See *Crawford v. State*, supra, at 168. Consistent with this proposition, our present construction of § 9.33(1), supra, "applies" the law of retreat only to the third person, and then only in the sense that it requires the accused to make the reasonable assessment, from his standpoint, that a reasonable person in the third person's shoes would not have retreated, before he may act with deadly force in that person's behalf.

The trial court erred in instructing the jury appellant could not be acquitted "if a reasonable person in *his* situation would not have retreated."

The judgment of the court of appeals is affirmed.

ONION, Presiding Judge, concurring.

I concur in affirming the judgment of the Court of Appeals, but on the basis of that court's opinion.

possibility of use of deadly force in defense of a third party, and if the actor may retreat *and still preserve the safety of the third party he or she seeks to protect,* then the actor must retreat and not exercise deadly force against the attacker." This is really no more than to say that if the actor's intervention is not "immediately necessary" to avert the attacker's use of deadly force, the actor may not himself resort to deadly force in defense of the third person. Such a construction, however, would render § 9.33(2), supra, a

TEAGUE, Judge, concurring in the result only.

"A Requiem Dedicated to the Kitty Genoveses of this Country"

It is now axiomatic that in the decade that commenced with the assassination of President Kennedy in 1963, and concluded with the separation of Tiny Tim from Miss Vicky in 1972, but perhaps even until now, violence in this country and State proliferated.

One of the reasons that has been given for what to many of us was a strange and unjustifiable phenomenon in this country is that citizens of this country and State became reluctant or afraid to get "involved" in deterring that violence, and refused to intervene in good faith on behalf of another person. "This reticence seemed to emanate less from fear of physical harm than from the potential consequences of a legal aftermath." *Alexander v. State*, 52 Md. App. 171, 447 A.2d 880 (Ct.Sp.App.1982). Judge Lowe, the author of that opinion, highlighted his statement with a reference to the well known case involving Katherine "Kitty" Genovese, whose screams and cries for help went unheard one night in New York City because persons in the neighborhood where she was assaulted and later murdered chose not to get involved, or intervene on Kitty's behalf, but chose, instead, to pull their window shades, blinds, or curtains, and shut their windows and doors, in order not to see or hear the butchery that was then taking place. Why did those good persons not come forth to aid Kitty, a fellow human being, who was then being mauled by nothing less than a rabies-infected animal, who was then disguised as a human being? Later, when interviewed, those persons, who have since that night

mere redundancy. Tex.Gov.Code Ann., § 311.-021 provides that "[i]n enacting a statute, it is presumed that ... the entire statute is intended to be effective." Unlike that posited by the dissent, our construction of § 9.33, supra, would give effect both to § 9.33(1)'s reference back to § 9.32(2), *viz.*, that the actor reasonably believe the *third party* could not reasonably retreat; *and* to § 9.33(2), supra, requiring that his intervention appear *immediately* necessary to protection of the third party.

been ridiculed and held in contempt throughout this great country in which we are blessed to live, stated that they did not intervene on behalf of Kitty because they believed that the law would not protect them from possible criminal charges if they had intervened and assaulted Kitty's wrongdoer and it was later found that they were wrong in what they thought and believed they saw and heard. Thus, it was their fear of legal consequences, and not necessarily their timidity or lack of bravery, that chilled their better instincts to intervene on behalf of Kitty!!! Do we want such thinking to exist in Texas? I, for one, do not.

I acknowledge that the facts of this case do not come close to those that existed in Kitty's case. However, I sincerely believe that if this Court places the duty to retreat upon a "good faith samaritan," who intervenes on behalf of another person in good faith and reasonable belief that the person in whose behalf he intervenes is in danger of being threatened with serious bodily injury or death as it obviously does in this cause, then we will see in the future "Kitty Genovese" type cases in this State, because our citizens and non-citizens will not intervene or get involved because of fear of the legal consequences of intervening or getting involved. Is this the kind of thinking that we want our citizens to have? I, for one, think not, and I sincerely believe that those persons who subscribe to total non-intervention, regardless of the facts and circumstances, should move to a place where such views are acceptable and in vogue. Cf. *People v. Young*, 11 N.Y.2d 274, 229 N.Y.S.2d 1, 183 N.E.2d 319 (Ct.App.1962), which held that a person who in good faith and reasonable belief goes to the aid of a third person does so at his own peril, which ruling apparently shocked the consciences of the then members of the New York Legislature to such an extent that they voted to change their law, causing a commentator to thereafter state that "if the *Young* case, supra, were to be litigated under the revised provision, [see *McKinney's Consolidated Laws of New York*, § 35.15, "Practice Commentaries"], a dif-

ferent result would be required." However, a careful reading of Section 35.15 leads me to conclude that the "Kitty Genoveses" of New York City are not much better off today than when the real "Kitty" Genovese was murdered, but I will, as I must, leave the interpretation of that statute to the appellate jurists of New York State.

The question that is before this Court is not whether the appellant had the lawful right to intervene on behalf of Joan Goodwin, who was then engaged in a controversy with Rodney Johnson, the deceased, because all appear to agree that he did, but is, instead, whether the trial judge in this cause erred when he instructed the jury that after the appellant took the first step to intervene, if the jury found that a reasonable person under the same facts and circumstances would have retreated, and the appellant did not do so, then he should be found guilty.

The majority opinion correctly affirms the decision of the Tyler Court of Appeals of *Hughes v. State*, 721 S.W.2d 356 (Tex. App.—Tyler, 1985), which held that the trial court reversibly erred in instructing the jury that the appellant had the legal duty to retreat before he shot and killed Rodney Johnson when he was defending Joan Goodwin, the object of the controversy that existed in this cause, if a reasonable person would have then retreated.

The Tyler Court of Appeals rejected the State's argument that a good faith intervenor who comes to the aid of another person only stands in the shoes that that person wore, and, because V.T.C.A., Penal Code, Section 9.32(2), requires that a person who is defending himself must, if a reasonable person would have thereafter retreated, retreat, the trial court's instruction that the appellant had to retreat was a correct instruction on the law.

The Tyler Court of Appeals relied heavily upon the Waco Court of Appeals' decision of *Crawford v. State*, 629 S.W.2d 165 (Tex. App.—Waco 1982, no P.D.R.). There, Justice Hall, speaking for that court, correctly

observed that to approve such an instruction as was given in that cause, which appears to be identical to the one given in this cause, "would require one who perceives another under attack by unlawful force, and believes that his intervention is immediately necessary to prevent the attack, to simply walk away if he can reasonably do so without injury to himself and leave the victim to the whims of the assailant." Justice Hall concluded for the Waco Court of Appeals: "This has never been the rule in Texas, and we hold that such rule was not intended by the Legislature by the reference in Penal Code article 9.33, supra, to articles 9.31 and 9.32. (167–168)."

I pause to point out that the instruction that was given in this cause and in *Crawford*, supra, did not come from Paul McClung's work entitled *Jury Charges for Texas Criminal Practice*, which has long been "the Bible on jury instructions" in this State. McClung himself, as far back as his 1981 edition, expressly made it clear several times that in such a situation the trial judge should not "include a duty to retreat in this charge." In fact, he was adamant about it: "Do not, REPEAT, do not include the duty to retreat in the charge on defense of a third person." He subscribed to this view long before *Crawford v. State*, supra, was decided by the Waco Court of Appeals. In 1981, he stated the following: "It would be most inconsistent to give a person the right to defend a third person, but require him, as a reasonable man, to run away before defending the third person." In 1985, he repeated this statement.

Judge Clinton concludes: "[O]ur present construction of § 9.33(1), supra, 'applies' the law of retreat only to the third person [the party on whose behalf the accused intervened], and then only in the sense that it requires the accused to make the reasonable assessment, from his standpoint, that a reasonable person in the third person's shoes [the party on whose behalf the accused intervened] would not have retreated, before he may act with deadly force in that person's behalf."

The problem that I have with Judge Clinton's conclusion is that he appears to somehow implicate into the scenario what the person on whose behalf the defendant intervened thought or believed. If that is what he means, then I must part company with the majority opinion because if that were the case there would have been no need for the Legislature to enact Section 9.33. Under Section 9.33, where the defendant has killed the deceased, the question is whether the defendant, *as he perceived the situation*, reasonably believed that it was necessary to use deadly force to prevent the person he perceived to be the assailant and wrongdoer imminently committing the offense of murder of the person on whose behalf he intervened. If the jury answers the question in the affirmative, then that ends the discussion, and the defendant is entitled to be found not guilty; if the jury does not so find, or does not have a reasonable doubt on the issue, then, as far as the defense of a third person goes, that defense just went out the window as far as the defendant is concerned.

To understand what the Legislature intended when it enacted Section 9.33, supra, it is necessary to revisit the common law.

At common law, the right of intervention by a third party was limited to the protection of those closely related to, or associated with, the intervenor. That restriction to family or close relatives evolved *not from the common law right of self-defense*, as most cases imply, but from "the primary law of nature," one right which flowed therefrom was the right to protect one's own property, i.e., his household, which included his wife, servants, etc. See *Alexander v. State*, supra, and the authorities cited therein, 447 A.2d at page 882.

The failure to recognize the distinction between the common-law right of self-defense and the common-law right of intervention by other than a stranger has caused many courts throughout this nation to adopt the rule that no deadly force could be justifiably employed by a person who intervened on behalf of another unless and until that person was himself justified in

using deadly force against the person he believed was the aggressor; thus, the majority rule that one who goes to the aid of another person obtains no greater rights than the person into whose shoes he then stepped. See *Young v. State,* supra. However, those jurisdictions that adopted the minority rule, that one who intervenes in a struggle between strangers under the mistaken but reasonable belief that he is protecting the person who he assumes or reasonably believes is being unlawfully threatened with death or serious bodily injury is thereby exonerated from liability, overlooked the distinction between an intervenor who was a stranger and an intervenor who was a member of "the family." This unfortunately appears to ·have once been the view in Texas, where the Legislature appears to have attempted to place into our law some of both the common-law right of intervention and the common-law right of self-defense. See Arts. 1142 and 1226, 1925 Penal Code. In Art. 1142(6), supra, it was provided: "Violence used to the person does not amount to an assault and battery in the following cases: 6. In self defense, *or* in defense of another against unlawful violence offered to his person or property." (My emphasis). When the Legislature enacted Section 9.33, supra, however, it did not carry over into the statute the phrase "In self defense." By its wording, it not only gave a stranger the right to intervene, but the right to kill as well.

A clear reading of Section 9.33 should make it obvious to anyone that in giving a stranger the right to defend a third person, the Legislature's focus of attention was on *the right to intervene,* and what right the intervenor thereafter had, and not on *the right of self-defense.* Thus, it did not concern itself in such instance with the requirement of retreat, which it could have easily done had it chosen to do so, see Section 35.15, New York Penal Code, supra, but contrary to the provisions of Art. 1142, supra, it chose not to even mention the law of self-defense in Section 9.33. It thus sought not to penalize the Good Samaritan who gambles through intervention not only his health and life but his freedom and reputation as well, i.e., the Legislature did not require that the Good Samaritan had to make a split second decision on whether or not to retreat if his original justification in intervening was done in good faith and as he perceived the situation he killed the deceased because he reasonably believed that such was necessary to prevent the deceased from killing the person on whose behalf he intervened. Thus, it did not intend to impose a legal duty to retreat on such persons because such a duty would annul the justification for the intervention in the first place. In short, our Legislature did not want any such cases as the one involving "Kitty" Genovese to ever occur in this State. The law of retreat, as found in our law of self-defense, see Section 9.32, supra, is simply not a part of Section 9.33, supra. Section 9.33, supra, was clearly intended "to encourage and to afford protection to 'good samaritans' by removing their legal doubts, which might impede crime prevention and deter those who witness violent assaults upon persons, but who otherwise would aid an apparent victim of criminal violence." *Alexander,* supra, 447 A.2d at page 884.

Thus, in this cause, the appellant's right to intervene and thereafter kill Johnson was not tied to Goodwin, but rather depended upon what caused or motivated him to intervene on Goodwin's behalf in the first place, and whether he thereafter reasonably believed that it was necessary to kill Johnson to prevent Johnson from killing Goodwin. The instruction by the trial judge in this cause, on the duty to retreat, for all practical purposes, sealed the appellant's fate, regardless of whether he reasonably viewed the situation, and then believed it was necessary to kill Johnson, and regardless of whether or not the jury might have believed that he was then and there acting in the capacity of a "Good Faith Samaritan." The trial judge clearly erred in giving the instruction that he did.

In light of this Court's majority opinion of *Almanza v. State,* 686 S.W.2d 157 (Tex. Cr.App.1984), should this Court remand the

cause to the court of appeals for it to consider and decide whether or not the erroneous instruction to the jury constituted "some" harm to the appellant? I do not think so because to do so would simply be engaging in appellate "ping-pong" justice, which I find is despicable. The ultimate responsibility of deciding whether or not there was "some" harm done the appellant rests with this Court now, and not later. Given the facts and circumstances of this case, it should be readily and easily seen, even by those persons who might be classified or characterized as being myopic, that "some" harm was done the appellant by the erroneous instruction that was given the jury in this cause. Nothing would be accomplished, except delay, in remanding the cause to the court of appeals.

For the above reasons, I only concur.

MILLER, Judge, dissenting.

The majority opinion not only severely restrains the legislative intent of V.T.C.A. Penal Code, § 9.32 and 9.33, it enacts a rule of defense of third persons that will in large measure place the actor/defendor in peril for his actions. It is inconceivable that the Legislature intended this result. I will lay out what I believe to be the correct analysis of this legal issue.

Both my analysis and the majority analysis agree that the actor/defendor must believe that his intervention is immediately necessary to protect the third person. Where we part ways is in the area of the actor/defendor's belief concerning retreat. The majority would have the actor/defendor reasonably believe that a *reasonable person in the third person's shoes would not retreat* (the majority opinion uses the past tense—would not have retreated—but the problem is better analyzed in the present tense the actor believed when he took the action). My analysis would have the actor/defendant reasonably believe that *he cannot retreat* and still preserve the safety of the third party. The State of course would have the actor/defendant believe that he himself would have to be threatened with unlawful deadly force be-

fore he could aid a third person being similarly threatened—an analysis rejected by everyone concerned.

At the time the instant offense was committed, Section 9.32 provided:

A person is justified in using deadly force against another:

(1) if he would be justified in using force against the other under Section 9.31 of this code;

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to protect himself against the other's use or attempted use of unlawful deadly force; or

(B) to prevent the other's imminent commission of aggravated kidnapping, murder, rape, aggravated rape, robbery, or aggravated robbery.

In 1983, subsection (3)(B) was amended to substitute the term "rape" with the term "sexual assault."

Section 9.33 provides:

A person is justified in using force or deadly force against another to protect a third person if:

(1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 of this code in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and

(2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

Initially, I recognize that an apparent conflict exists between the statutes. In self-defense involving the use of deadly force, the Section 9.32 duty to retreat may be logically and successfully coupled with the required belief that such force is immediately necessary to prevent the other's unlawful use of deadly force; *viz.,* if there is no immediate need for the use of deadly force in self-defense, then retreat must also

be reasonable. Though not synonymous, these two requirements, retreat and immediate need for use of deadly force, complement each other throughout the various scenarios that unfold in self-defense against deadly force situations.

These two requirements, however, become paradoxical when applied to situations involving use of deadly force in defense of a third party. Section 9.33 seems to require that a protector choose between retreating from an altercation that he has not even entered into or saving someone in that altercation whose life is in danger. Thus, a conflict arises. In order to resolve this apparent conflict, a brief discussion of the concept of the duty to retreat prior to the use of deadly force in a self-defense situation is necessary.

Prior to the January 1, 1974, the effective date of the new penal code, there was no duty to retreat appended to the right of self-defense, and in some cases, specific statutory references dispensed with such a duty. See Article 1225, V.A.P.C. (1925). See also *Sternlight v. State*, 540 S.W.2d 704 (Tex.Cr.App.1976), and cases cited therein at 705.

The new penal code took a completely different course, codified the old common law, and provided that use of deadly force was justified only if the actor could not have reasonably retreated. Worded differently:

"if the actor may retreat in complete safety [to himself], then the use of defensive force is not necessary."

Vol. II, Section 131(c), *Criminal Law Defenses*, Robinson (1984), p. 80. In *Crimes of Violence*, Section 612, Bailey and Rothblatt (1973), p. 480–81, the writers state:

" ... retreat need not be attempted when to do so will not diminish or will, in fact, increase the peril."

In Vol. I, Section 235, *Wharton's Criminal Law and Procedure* (1957), states at pages 509–15:

"These courts [that impose a duty to retreat] hold that before the right to kill in self-defense may be claimed, the defendant must have retreated either as far as he could, by reason of some wall, ditch or other impediment, or as far as the fierceness of the assault would permit him ... [which indicates] ... *a retreat to the limits of personal safety.*" (emphasis supplied).

Of course the relevant "safety" is that of the actor: if the actor may secure his own personal safety by retreat, then such retreat is necessary and the use of deadly force to protect one's self will not be justified.

With this rule of retreat for one's *own* personal safety in mind, I will address the apparent conflict in the present statutory scheme. Under Sec. 9.33, the actor's use of deadly force in defense of a third person must be justified under Sec. 9.32, before the use of such force is permitted. Under Sec. 9.32, the actor has the duty to retreat if he can do so in complete safety. Thus, an actor is justified in using deadly force in defense of another only if he could not have reasonably retreated to prevent harm *to himself.*

As urged by appellant, and as found by the Tyler and Waco Courts of Appeals, this construction eliminates any useful application of the justification for use of deadly force in defense of another. As stated in *Crawford v. State*, 629 S.W.2d 165, 168 (Tex.App.—Waco, 1982, no pet.)

" ... [The manner in which the statutes are worded] would require one who perceives another under attack by unlawful force, and believes that his intervention is immediately necessary to prevent the attack, to simply walk away if he can reasonably do so *without injury to himself* and leave the victim to the whims of the assailant." (emphasis supplied)

Given this conflict, we are called upon to determine whether the statutes may be reconciled. Under Tex.Gov.Code Ann., § 311.011 (Vernon's 1986), this Court is required to read words and phrases in context and construe them according to the rules of common usage. Under Sec. 311.023, in construing ambiguous statutes, we may

consider, among other factors, the following:

(1) the object sought to be attained;

(2) any common law or former statutory provisions, including laws on the same or similar subjects; and,

(3) the consequences of a particular construction.

The object of justifying the use of deadly force in self-defense is to guarantee the right of self-defense to persons facing deadly force attack by someone else. "One who is attacked may repel force with force in order to protect himself." 21 Tex.Jur.3d *Rights of Accused* § 1712 (1982), and cases cited in footnote 46 at p. 566. Thus, the law permits a person to protect himself, even to the point of killing the aggressor, if he or she must do so to protect his or her own life.

Similarly, the object of justifying the use of deadly force in defense of a third person is to allow the actor to protect the victim from deadly force attack by the aggressor, unfettered by fear of legal reprisal. "The ordinary doctrine is that whatever one may do for himself he may do for another...." *Id.* Thus, the use of deadly force is permitted in order to preserve the life of a third party.

With regard to the use of deadly force, these two objectives are counterbalanced by society's interest in the preservation of life: deadly force may be used only if there is no other reasonable option that will preserve the safety of the person under attack. Professor Robinson, in *Criminal Law Defenses,* supra, states:

" ... [T]he protection of life has such a high place in a proper scheme of social values that the law cannot permit conduct which places life in jeopardy, when the necessity for doing so can be avoided by the sacrifice of the much smaller value that inheres in standing up to an aggression."

*Id.* at 84–5. In order to preserve the valud of life, the legislature requires that, prior to the use of deadly force in self-defense, the actor must not have had a reasonable opportunity to retreat.

At this juncture, the conflict in the statutes becomes troublesome. Certainly, when a person is *himself* under attack by deadly force, prior to using deadly force in self-defense he must retreat if he can do so without unreasonable risk to *his own personal safety.* As discussed earlier, and as urged by the State, Sec. 9.33 seems to require that when a person is faced with deadly force attack upon a *third party,* that person must likewise retreat if he can do so without unreasonable risk to *his own personal safety.* Obviously, this construction does not serve to effectuate the object of Sec. 9.33, which is to *encourage* persons to act in defense of others. This reading also presents an inherent conflict of duty within Sec. 9.33 itself by simultaneously requiring retreat from a situation where deadly force is immediately required to save the third party's life, but where the actor (not being the object of the attack) is in no danger at all.

Given the previous rules of construction, we must determine whether there is another interpretation of the statutory language which will effectuate the object of the statutes without requiring, as did the Waco and Tyler Courts of Appeals, that part of one statute be declared in fatal conflict with the other. Fortunately in this case, such an interpretation is possible.

The object of Sec. 9.32 is self-defense. This objective, however, must not be obtained at the unnecessary cost of human life. Thus, if the actor facing deadly force attack can reasonably retreat and not exercise deadly force in counter attack, the actor is required to do so. His safety is preserved, and so is the life of the attacker. Similarly, the object of Sec. 9.33 is preservation of the life of the third party. If that objective may be obtained without the use of deadly force, then the actor must take such action.

Based upon these goals and considerations, I would therefore hold that the retreat requirement of Sec. 9.32 is to apply to Sec. 9.33 in the following manner: where the circumstances raise the possibility of

use of deadly force in defense of a third party, and if the actor may retreat *and still preserve the safety of the third party he or she seeks to protect,* then the actor must retreat and not exercise deadly force against the attacker. The standard of maintaining the safety of the third person is the same standard as that of maintaining one's own personal safety in self-defense. This construction accommodates the objective of Sec. 9.33, which is to preserve the life of the person under attack, and balances that objective with society's interest in always avoiding the unnecessary loss of human life, in this case, that of the attacker. To the extent that *Crawford,* supra, is in conflict, it should be overruled.

Moreover, this construction does not require elimination of the statutory language. The Waco and Tyler Courts of Appeals simply deleted the retreat requirement from Sec. 9.33, finding that including such a duty did not make sense. Other authorities support such a deletion.[1]

Appellate courts are required, however, to strive to interpret statutes without changes to the particular wording, and with an eye for reconciling possible conflicts whenever possible. We are guided by Tex.Gov.Code Ann., § 311.021 (Vernon's 1986), titled "Intention in Enactment of Statutes", which states:

> In enacting a statute, it is presumed that:
> (1) compliance with the constitutions of this state and the United States is intended;
> (2) the entire statute is intended to be effective;
> (3) a just and reasonable result is intended;
> (4) a result feasible of execution is intended; and
> (5) public interest is favored over private interest.

This construction, as set forth above, resolves the conflict with no change to the wording of the statutes by applying the reasons supporting the retreat requirement to the object of the particular statute. In Sec. 9.32, the object is preservation of ones own life, and in Sec. 9.33, the object is preservation of the third party's life. This interpretation better reflects the legislative intention presumptions set forth above from the Government Code. Such a construction is, therefore, more acceptable under statutory construction rules.

The majority analysis, requiring that the actor believe that a reasonable person in the third person's situation would not retreat, sounds nice and neat at first blush. It works well in one of the possible scenarios; where the actor believes the third person needn't retreat and in fact does not. But what of the situation where the actor isn't sure the third person can or should retreat? It is quite foreseeable that an actor would have sufficient facts perceived to believe deadly force is immediately necessary, but not have facts to evaluate whether the third person should retreat (an entirely different matter). What of the situation where the actor thinks the third person should retreat but that person doesn't? Must the actor stand by and watch until the situation (as he perceives it—not as the third person perceives it) changes? What about the situation where the actor believes the third person needn't retreat but that person is in fact retreating? Under the majority's holding there is no answer to these scenarios that effectuates the clear legislative intent manifested by § 9.32 and § 9.33.—protection of third persons against unlawful deadly force. Rather, the majority stifles the contemplated action of an actor.

For the foregoing reasons I dissent.

W.C. DAVIS, J., joins.

---

1. McClung's *Jury Charges for Texas Criminal Practice* (revised edition, 1983), contains the following statement on page 328:
   "Do not include the duty to retreat in the charge on defense of a third person. It would be most inconsistent to give a person the right to defend a third person, but require him, as a reasonable man, to run before defending the third person. See *Crawford v. State,* 629 SW (2) 165 (Waco App); Dobbs 100 SW 946."