# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-01-00057-CR
---

**Fabeolia Singleton, Appellant**

**v.**

**The State of Texas, Appellee**

---
### FROM THE COUNTY COURT AT LAW NO. 5 OF TRAVIS COUNTY
### NO. 519-856, HONORABLE GISELA TRIANA, JUDGE PRESIDING
---

This is an appeal from a jury conviction for the Class A misdemeanor offense of assault with bodily injury. In one ground of error, appellant complains of the district court's refusal to submit an instruction on defense of another. *See* Tex. Pen. Code Ann. § 9.33 (West 1994). We find that there was no credible evidence to require submitting the instruction. We affirm the conviction.

## FACTS

The victim in this case, Joanna Luera ("Luera"), testified that on November 2, 1998, she and her 84-year-old mother and two-month-old baby were returning from an eye doctor appointment. Luera stopped at Church's Fried Chicken ("Church's") on Riverside Drive in Austin, Texas, to pick up lunch. She parked in a handicapped parking space. Her mother had a handicapped

parking placard which Luera hung on her rearview mirror. The restaurant was very crowded and there was a wait. Luera got her order of chicken, which she was taking home to her father, left the restaurant and returned to her car. Her baby and her mother were in the backseat. She noticed that a turquoise Ford pickup truck had parked behind her parking space blocking her.

She went into the restaurant and asked whose truck was parked behind her. A woman ("appellant") answered that the truck was hers. Luera asked her to move it so that she could leave and appellant could have her parking spot. Luera testified that she was "very nice" about her request. In response, appellant answered "no," she would not move her truck--that Luera would have to wait until appellant got her chicken and left. Appellant was reportedly "hateful" and refused to move her truck.

Luera said that she was shocked by appellant's response, but that she went out to her car and waited "awhile." Luera then went back in and asked the Church's manager to ask appellant to move her truck. The manager told appellant that she must move her truck otherwise she would not be served and the police would be called. Appellant then announced (in rather vulgar terms) that she was going to the restroom and would be there a while.

Meanwhile, back outside Church's, Luera was waiting next to her car and noticed another woman in appellant's truck. The woman was Shonicle Kincheon ("Kincheon"), appellant's daughter. Kincheon exited the truck and approached Luera. She asked Luera if she had a problem. Luera said, "yes," she needed the truck moved so she could leave. Kincheon continued to approach Luera asking, "what's your problem?"

2

The door to Luera's car was open and Luera was standing between her car and her car door waiting to leave. As Kincheon got closer, appellant came out of the restaurant screaming at Luera, "don't be f_ _ _ _ _ with my daughter" or I'll "f _ _ _ you up." Appellant ran up to Luera and slammed her own body into Luera's car door which then struck Luera's chest and knocked her backward. Luera grabbed the door and pushed back to regain her balance. At that point, both appellant and Kincheon started swinging their fists and hitting Luera about the head, face and shoulders. Luera fell back onto the front seat of her car with both women on top of her. Luera's mother and baby were still in the backseat. Luera said that she tried to shield her head with her arms during the attack.

Restaurant patrons came out to the parking lot and pulled appellant and Kincheon off Luera. As appellant was pulled away, she kicked Luera just under the chin. Someone in the crowd then announced that the police were on their way, at which point appellant and Kincheon jumped in their truck and sped off, peeling their tires. Luera testified that she did nothing to provoke either appellant or Kincheon. She also said that based on what she witnessed, appellant was not physically disabled. The State introduced photographs of Luera's injuries from the beating, including scratches, cuts, bruises and swelling.

Two of the patrons who were in Church's at the time testified and essentially corroborated Luera's story. Tonette Gallant ("Gallant") testified that appellant parked behind Luera's car, refused to move, and told Luera that she would have to wait until appellant got her chicken. She said that Luera asked appellant to move her truck "in a nice way." When appellant came out of the restroom, Gallant said that she was hollering, "don't be fighting with my daughter,"

3

but that Luera and Kincheon "were just standing there." Gallant testified that appellant did not act as if she were handicapped.

Gallant said that appellant body-slammed Luera's car door and then both appellant and Kincheon proceeded to attack Luera pinning her down on the car seat. She said that there was no way Luera could have retreated. Gallant also testified that Kincheon could have walked away from the fight. When asked whether Kincheon was in control of the situation and could have walked away at any time, Gallant answered, "right." She said she did not see Luera provoke or strike at Kincheon. Finally, Gallant testified that while Luera was visibly injured after the altercation, appellant and Kincheon were not.

Mildred Diwek was in the company of Gallant and her testimony essentially corroborated Gallant's. She said that when Kincheon left the restaurant, she had words with Luera but that Luera did nothing to provoke the daughter. When appellant came out of the restroom, she said "nobody messes with my daughter," then rushed out the restaurant door and pushed herself into Luera's car door. Appellant then wedged Luera next to the car and began "hitting her like crazy." Diwek said that Kincheon did not begin fighting until after her mother started hitting Luera.

Diwek also testified that Kincheon could have walked away from the altercation even before her mother came out of the restaurant. Diwek said that appellant could have avoided the altercation and could have walked away from it once she did become involved. Diwek was clear that Luera was not the aggressor.

The Church's manager, Guy Hobbs, also testified. Although he was not able to see what transpired in the parking lot after appellant left the restaurant, he corroborated Luera's version

4

of the events inside the restaurant. He said Luera asked him to have appellant move her car and that appellant refused. He said that appellant was a regular customer and that he was not surprised by her response to Luera's request to move her truck. After he told appellant that she would not be served, she went to the restroom. When she emerged, she went directly outside.

Kincheon testified that she and her mother went to Church's after her mother picked her up at school. She admitted her mother parked behind a lady that was parked in the handicapped parking space. After Kincheon left the restaurant, she said that she walked back toward the truck and as she passed Luera's car, Luera suddenly shoved the car door into Kincheon. Kincheon testified that Luera then started cussing and swinging at her. Kincheon swung back and Luera began to fight with her. Kincheon said that when her mother came out, her mother "restrained me back on the other car and she restrained the woman back on her car." Kincheon said she was sure that Luera swung at her first. When confronted with her prior written statement in which she said that she swung at Luera first, Kincheon changed her testimony.

On cross-examination, Kincheon testified:

Q. . . .[H]ow far away were you from your own truck?

A. Maybe 10, 15 feet.

Q. So you could have walked back over to the truck, couldn't you? You could have walked away at any time, couldn't you?

A. Could have, but she hit me.

Q. So after she opened her door on you, you could have just walked away? Wouldn't have been any trip at all if you had just walked away?

A. No.

5

Q. But you chose to stay?

A. Yeah.

Appellant testified at trial. She admitted that she parked her truck behind Luera's car blocking her in the parking space, but insisted that Luera was the aggressor. She claimed that Luera did not have a handicapped parking permit, but that appellant did. Appellant did not affirmatively state that she was handicapped, although she implied it. She said that she intended to call the police regarding the parking violation and blocked the car with her truck in order to hold it there for the police. She said that she asked the manager to call the police but that he ignored her "as usual."

According to appellant, it was Luera who came in the door yelling obscenities. Appellant said she told Luera that she was the one who blocked her in. She said Luera was mad and just stood there waiting for appellant to move. Appellant said that she "was going to get up and let her out and then pull into the parking space, but she [Luera] said something to me that I didn't like, so I just told her, no, you're going to wait now." When the manager told appellant that she would not be served if she did not move her truck, she went to the restroom. She was in there about three minutes when her daughter came in and told her that she should "get out here. That lady [Luera] is acting crazy, cursing." When she came out of the restaurant, appellant testified, Luera and her daughter had already started fighting and that her daughter was "beating up on her [Luera]." Appellant said that her response was "[t]o stop it." She said she told Kincheon to "go to the truck. Sit there and don't move." When she grabbed Kincheon, Luera

6

kept swinging over me hitting me in the face and scratching me. She was still trying to get to my daughter. I looked down at my daughter [sic] leg and I saw it was bleeding when she was going to the truck.

She claimed that she was just trying to restrain Luera, that "she was trying to get away."

On cross-examination, appellant testified as follows:

Q. And your daughter was getting the better of Ms. Luera, wasn't she?

A. Yes.

Q. Your daughter didn't need any help with Ms. Luera, did she?

A. That's why I broke it up.

Q. You could have walked away at any time. You didn't have to go over there and involve yourself, did you?

A. Well, I was stopping it.

Q. You were stopping it for Ms. Luera's benefit?

A. No, stopping it for my daughter [sic] benefit. I don't approve of her fighting.

Q. But she didn't need any help. She wasn't in any danger, was she?

A. Yeah, she was in danger.

Q. She could have walked away at any time, couldn't she?

A. Not with her leg in that condition.

* * *

Q. . . .your daughter didn't need any help with Ms. Luera; isn't that right? Your daughter was more than a match for Ms. Luera, wasn't she?

A. For a 17-year-old I think she was.

* * *

7

Q. When you went down there, were you going down there to help your daughter in the fight?

A. No, I was not going to help her. I was going to stop the fight.

Appellant denied hitting, shoving or kicking Luera, claiming that she only restrained Luera by pinning her against the car door.

**DISCUSSION**

Appellant contends that the court's refusal to submit an instruction on defense of another in the jury charge was reversible error. The standard of review for determining whether there was reversible error in the jury charge is governed by *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994). First, we must determine if there actually exists error in the jury charge. *Id*. We make this determination by searching the entire record for more than a scintilla of evidence to support the submission of the requested instruction. *See Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994). Second, if charge error is found to exist, we determine if sufficient harm resulted from that error to require a reversal. In this case, we need not go further than the first prong of the analysis. No charge error occurred because there was insufficient evidence as a matter of law to require the submission of the requested instruction.

A defendant is entitled to an instruction on any defensive issue that is raised by the evidence, regardless of whether the evidence is weak or strong, unimpeached or contradicted, and regardless of the court's opinion of the credibility of the defense. *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996). Viewing the evidence in the light most favorable to appellant, we must

8

determine whether there is any evidence that appellant reasonably believed that her intervention was immediately necessary to protect her daughter. *See Constancio v. State*, 643 S.W.2d 153, 156 (Tex. App.—Austin 1982, no pet.).

Appellant's defensive theory is governed by section 9.33 of the Texas Penal Code, which provides:

> A person is justified in using force or deadly force against another to protect a third person if:
>
> (1)  under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2)  the actor reasonably believes that his intervention is immediately necessary to protect the third person.

Tex. Pen. Code Ann., § 9.33 (West 1994). Application of section 9.33 depends on the defendant's assessment of the circumstances at the time of the offense because it places the defendant "in the shoes of the third person." *Hughes v. State*, 719 S.W.2d 560, 564 (Tex. Crim. App. 1986). If the defendant reasonably believes that the third person would be justified in using force to protect herself, then the defendant may exercise force on behalf of that third person. *Id*. Answering this question requires a determination under section 9.31 of whether the third person was justified in using force to protect herself.

Section 9.31(a) of the Texas Penal Code provides that one's use of force is justified if it is "immediately necessary to protect" oneself from the "other's use or attempted use of unlawful force." Section 9.31(b) delineates the exceptions this defense, including when it is in response to

mere verbal provocation alone or when the actor "provoked the other's use or attempted use of unlawful force." Tex. Pen. Code Ann. §9.31(b)(1), (4) (West 1994). Thus, a defendant is not entitled to use force in self-defense when she provoked the incident out of which the offense arises (unless she satisfies the exception to the exception found in section 9.31(b)(4)(A), (B)). *See Hanley v. State*, 921 S.W.2d 904, 911 (Tex. App.—Waco 1996, pet. ref'd).

The overwhelming weight of the credible evidence indicates that Kincheon was the aggressor and instigated the argument with Luera prior to her mother leaving the restaurant. Kincheon, thus, would be disqualified from the defense of self-defense under section 9.31 (a) and (b). However, the evidence is conflicting on these points. We are required to view the evidence favorably to appellant in determining whether she was entitled to a defensive charge. Therefore, we assume for the sake of our analysis that Luera was using unlawful force against Kincheon, that Kincheon was not the aggressor, and was entitled to defend herself against Luera.

There is an objective, temporal component to section 9.33. In addition to the third person's justification to use force, a defendant must reasonably believe that her intervention and use of force on behalf of that third person was *immediately* necessary to protect the person. Tex. Pen. Code Ann. § 9.33(2). A defendant's testimony that she subjectively believed her actions were necessary to protect the third person is not sufficient. The objective circumstances must indicate that the defendant's subjective belief was reasonable before a defensive instruction under section 9.33 is required. *Pena v. State*, 635 S.W.2d 912, 914 (Tex. App.—Eastland 1982, pet. ref'd). Objective indications could include acts conveying an imminent threat towards the third person. *See, e.g., Hughes*, 719 S.W.2d at 564; *McDonald v. State*, 597 S.W.2d 365, 367 (Tex. Crim. App. 1980), *cert.*

10

*denied*, 449 U.S. 1010 (1980); *Cooper v. State*, 910 S.W.2d 605, 606 (Tex. App.—Tyler 1995, no pet.).

Even if we assume that Kincheon was entitled to defend herself in this altercation, there is no evidence that appellant could reasonably believe that her intervention was immediately necessary to protect Kincheon. Appellant's own testimony belies her defense. Appellant admitted that at the time she intervened Kincheon "was getting the better of Ms. Luera" and that her "daughter didn't need any help with Ms. Luera." She testified that breaking up the fight was her reason for intervening. She did not approve of Kincheon's fighting so she said she intervened to stop the fight. When asked whether she "went down there" to "help [her] daughter in the fight, appellant responded, "[n]o, I was not going to help her. I was going to stop the fight."

By all accounts, Kincheon was not in need of protection from Luera. Neither appellant nor Kincheon testified to any facts which would lead appellant to reasonably believe that her intervention was immediately necessary to protect Kincheon. Instead, appellant testified that she intervened to stop the fight because she did not approve of Kincheon's fighting. *See Hanley*, 921 S.W.2d at 907 ("Hanley testified that he did not go to the parking lot to defend Hardwick; rather he 'wanted Pat Wright to do what he said he would do. . . to stay out of Angela's life."). As appellant was not entitled to a defensive instruction under section 9.33, we hold that the district court did not err in refusing that instruction.

We also conclude that appellant was not entitled to an instruction on defense of another because all the evidence showed that it was appellant who provoked the entire incident. Appellant initiated the altercation by parking her truck in such a way as to block Luera's vehicle in

11

the parking space and then refusing to move it.  Because appellant was the primary actor provoking the confrontation, she cannot then claim that her actions were necessary for the defense of another. *See Hanley*, 921 S.W.2d at 710; *Leach v. State*, 726 S.W.2d 598, 600 (Tex. App.—Houston [14th Dist.] 1987, no pet.).

## CONCLUSION

For these reasons, the judgment of the county court at law is affirmed.

_____

—

Mack Kidd, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed:   March 14, 2002

Do Not Publish