**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00107-CR**
_____

**RANDY STEVEN ESTRADA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-12-15700-CR**

**MEMORANDUM OPINION**

Luis Ortiz ("Luis" or "Ortiz") died from multiple gunshot wounds he received on December 18, 2020. A grand jury indicted Appellant Randy Steven Estrada ("Appellant," "Randy," or "Estrada") for Ortiz's murder. Estrada pleaded "not guilty," but a jury found him guilty of first-degree murder and sentenced him to twelve years of imprisonment. Estrada raises two issues on appeal: (1) the trial court erred by denying his request for an instruction on defense of third persons, and

(2) the trial court erred by talking to a juror when Estrada's attorney was not present. As explained below, we overrule both issues and affirm the judgment of conviction.

Evidence at Trial: Witnesses for the State

At the beginning of the trial, the State published to the jury Exhibit 1, an audio recording of Estrada's 911 call from the night of December 18, 2020. In the recording, Estrada tells the 911 operator that he shot someone. Estrada tells the operator he shot "my baby mama's boyfriend." The operator asks Estrada why he shot him, and Estrada replies, "they wanted to fight [and] I told them to leave the house." Estrada also told the operator that the children were in the house.

Testimony of Sergeant Benjamin Polansky

At the time of trial, Sergeant Benjamin Polansky testified that he was working for the Texas Highway Patrol in Laredo, but in December of 2020, he worked with the Texas Highway Patrol in Montgomery County. Polansky recalled that on the night of December 18, 2020, he received a high priority call about a shooting in Montgomery County. Polansky was wearing his body camera when he arrived at the scene. Polansky identified State's Exhibit 4 as video from his body camera of the scene where the shooting occurred, and the exhibit was admitted into evidence and published to the jury. The video depicts officers arriving at the scene and going into the home, where they encounter children in a bedroom. In the video, Estrada's former girlfriend, Barbara, tells Polansky that all her children are inside.

<u>Testimony of Charlie[1]</u>

Charlie testified that he worked in construction and dirt moving, and he hires from fifty to ninety people, both employees and subcontractors. Charlie testified that he had known "Barbara" since she was three or four years old, they lived across the street from one another, and about five years before trial, Barbara started working for him. He agreed that he and Barbara had a romantic relationship off and on for some time. Charlie also testified that Luis Ortiz had worked for him for several years. Charlie recalled that he met Randy through Barbara when Barbara and Randy started dating, and that Barbara and Randy moved next door to Charlie at some point. According to Charlie, Randy had worked for him from time to time, he had known Randy for thirteen or fourteen years, and Charlie identified the defendant as Randy Estrada. Charlie testified that in December of 2020, Barbara and Luis had been in a romantic relationship for several months, and they were living together. Barbara and Randy were no longer living together, but they were still coparenting.

Charlie recalled that on December 18, 2020, he, Barbara, and Luis went to a restaurant for dinner, and while they were eating, one of Barbara's children, Sam—whose father is Randy—called her from Randy's house. Sam wanted to come home

---

[1] We use pseudonyms to refer to persons not affiliated with law enforcement or expert witnesses except for the Appellant and the deceased.

3

to Barbara's house because Sam was not getting along with his father, and Charlie, Barbara, and Luis went to Randy's house, each driving their own vehicle.

Charlie testified that Barbara pulled into the driveway and went into Randy's house, and Luis and Charlie parked on the street where they waited for five or ten minutes. After a few minutes, Randy came outside and talked to Luis and Charlie and told them to come talk to him. Charlie and Luis approached the house, Charlie stood with one foot on the front step, and Luis was behind Charlie. Charlie testified that he and Randy talked about work for about five minutes, and then Randy asked Charlie to leave. Charlie stepped to the side of the yard and leaned against a trampoline. Charlie testified that, "maybe a second or two later, Randy said something and [Charlie] did not make out what it was and almost at the same time, [Randy] pulled his gun out and shot three shots." Charlie recalled that Barbara and the children were standing on the porch, and when Barbara tried to stop Randy, Randy pushed Barbara down and then he ran to where Luis was lying face down and Randy shot Luis again "multiple times" while Barbara tried to stop Randy. Charlie testified that before Randy started shooting, Luis did not say anything to Randy, and he did not do anything to Randy to threaten serious bodily injury or death.

Charlie testified that when the shooting started, Charlie ran for his truck, and called 911, who instructed him to perform CPR, and Charlie got his gun from the truck and went towards Luis. Charlie recalled that he laid his gun at Luis's head

4

because he did not want any more shooting to happen. According to Charlie, he then rolled Luis onto his back and started CPR. At one point, Barbara picked up Charlie's gun, but after Charlie told her not to, she laid it back down. When Charlie heard sirens from the police coming down the road, he "picked [his] gun up, put it back [on] [his] hip and put [his] jacket back over it and continued CPR." An audio recording of Charlie's 911 call was admitted into evidence and published to the jury. Therein, Charlie tells the dispatcher that "a guy's just been shot[,]" "for no reason he shot him fifteen times[,]" and "we were just sitting there talking [] and he just pulled a gun out and shot him fifteen times."

Charlie recalled that when emergency personnel took over CPR, Charlie put his gun back in his truck. According to Charlie, at first he did not tell the police he had a gun in his truck, but when they asked him if he had a gun, Charlie told them he did, and the police collected his gun. Charlie recalled that his gun was in his truck until Randy started shooting. Charlie testified that he did not see a gun on Luis when he rolled Luis onto his back. According to Charlie, neither he nor Luis threatened Randy with deadly force that night.

On cross-examination, Charlie agreed that he had told Barbara that night that he was going to back up Luis and "make sure that nothing happened [and] that he didn't get beat[en] up[,]" and he said he did not have any problems with Randy. According to Charlie, Randy fired three shots from the porch and then stepped down,

5

went over to Luis, and continued to shoot Luis. Charlie testified that after doing CPR on Luis, he had a lot of blood on himself, he washed his hands at some point, and he assumed there was blood on his gun because his hands were bloody when he picked it up. Exhibit 4, the recording from Sergeant Polansky's body camera, shows Charlie using hand wipes to clean his hands. Charlie recalled the police looking at messages on his phone at the scene. He also testified that he told the police he had an intimate relationship with Barbara and that he was married to Sara, but he and Sara were separated.

Testimony of Kimberly Christensen

Kimberly Christensen testified that she is a crime scene investigator for the Montgomery County Sheriff's Office, and she previously was a patrol deputy. Christensen agreed she was asked to go to a scene in New Caney on December 18, 2020, at about 10:40 p.m. with a search warrant. Christensen identified State's Exhibits 3 through 33, 45 through 52, and 137 through 138 as photos of the scene that night. Christensen identified three cell phones lying on the ground in Exhibits 21, 22, and 23. She also identified some fired cartridge casings, and she testified that she recovered a total of eleven fired cartridge casings at the scene, which included a fired cartridge found in the gun itself. According to Christensen, all the casings she collected at the scene had the same headstamp from a .40 caliber Smith & Wesson brand. Christensen identified State's Exhibits 47 through 49 as photos of the kitchen

6

at the home, and she testified that the photos were significant because "[t]he firearm was located on top of the cupboard." According to Christensen, the firearm was a .40 caliber semiautomatic Glock pistol that had "the magazine [] seated in [with] one unfired cartridge in it, and [] there was a fired cartridge casing in the chamber." Christensen testified that she took gunshot residue ("GSR") swabs from Barbara and Randy, that night but she did not take a GSR sample from Charlie because he had cleaned his hands with hand sanitizer.

Christensen testified that after evidence was collected at the scene, she "function tested" the firearms, including Charlie's .40 semiautomatic H&K pistol and Randy's .40 semiautomatic Glock. She also testified that she took buccal swabs from Charlie and DNA swabs from the guns. According to Christensen, she found thirteen cartridges in Charlie's gun. Christensen also identified items of clothing from Luis that she received from the medical examiner's office, including a knife that had been recovered from Luis's pants pocket. Christensen testified that Luis's clothing was sent to the Department of Public Safety ("DPS") for GSR testing.

Testimony of Patricia Bui

Patricia Bui testified that she is the Firearms Examiner for the Montgomery County Sheriff's Office Crime Laboratory, and she previously worked for ATF and DPS. When she received the firearms collected in this case, she checked and measured them. Bui testified that, after performing her analyses, she concluded that

7

the fired cartridge cases found at the scene were all fired by the Glock pistol, and none were fired from Charlie's H&K pistol. According to Bui, "[t]here were not any fired cartridge cases that [she] identified back to the H&K pistol from the crime scene."

Testimony of Investigator Jeremy Thomas

Jeremy Thomas testified that he is an investigator at the Montgomery County District Attorney's office assigned to the Digital Forensic Unit and the Internet Crimes Against Children Task Force. Thomas explained that digital forensics involves the examination of computers, cell phones, networks, and vehicles. He agreed he assisted with an extraction performed on the defendant's cell phone in this case, including a second extraction from the cell phone pursuant to a search warrant when new software was available. He agreed he performed a full file system search on Randy's cell phone. Thomas agreed his report includes conversations from the cell phone dated December 18, 2020, and the day before, and it included conversations Randy had with Barbara, Charlie, and Luis. Thomas identified State's Exhibits 122 through 128 as extraction reports generated from the original extraction from the cell phone.

Testimony of Detective Jeremy Kader

Jeremy Kader testified that he is a detective for the Montgomery County Sheriff's Office, he responds to scenes, interviews witnesses, and reviews evidence.

8

Kader was on call in the Homicide Division on December 18, 2020, and he received a call to go to the scene in this case. Kader recalled that when he arrived, he began interviewing witnesses, including Barbara, Charlie, and Randy. According to Kader, he learned that officers were going to collect GSR from people at the scene but not from Charlie because Charlie had used hand sanitizer to clean blood from his hands. Kader testified that he also obtained DNA swabs from Barbara, Charlie, and Randy, and he received cell phones for Barbara, Luis, Randy, and Randy's son Sam, but he did not get Charlie's phone.

Kader agreed that he reviewed the records of the phones after their content was downloaded. The Detective identified State's Exhibits 76 through 87 as what he observed on Randy's phone. Kader testified that Exhibit 78, a screenshot of "chats" from Randy's phone included two messages that state, "I just shoot Flaco." According to Kader, the first time he saw that message was when the device was found on the ground at the scene on the night of the shooting, and while he was working to determine who owned the device, he noticed "a reference to the shooting on the screen" when he picked up the phone. Kader recalled that when he first performed an extraction from Randy's phone, he could not find these messages, but after he was contacted by Investigator Thomas about doing a new download, he was able to find the messages.

9

Kader testified that messages retrieved from Barbara's phone reflect that she and Charlie anticipated there could be a fight that night. Kader confirmed that messages retrieved from Randy's phone indicated that Randy sent a message to someone saying that he was getting a restraining or protective order. Kader also testified that messages retrieved from Barbara's phone indicate she had communicated with Randy about getting a restraining or protective order and Randy would not be able to see his children, one message included an attached handwritten protective order, and these messages occurred about the same time that Randy had messaged someone about a restraining order. According to Kader, messages between Barbara and Randy at about 8 p.m. on December 18, 2020, reflect that Barbara told him she was going to his house and would "knock the 'F'" out of him, and Randy told her not to come to his house. Kader testified that the call to 911 from Charlie was at about 9:10 p.m. Then Randy called 911 at about 9:11 p.m. Kader further testified that the download from Randy's phone shows an outgoing Facebook Messenger message from Randy at about 9:14 p.m. saying, "I just shoot Flaco" and another one at 9:16 p.m.

Detective Kader testified that he reviewed the recording of Randy's 911 call and there was no discussion of anyone having a weapon other than Randy. He also testified that, in speaking with Randy at the Detective's office, there was no mention of Randy seeing someone else with a weapon nor of Luis threatening Randy's life.

10

On cross-examination, Detective Kader testified that, even though a knife was found in Luis Ortiz's pocket, based on Kader's review of the witness statements and other evidence, he concluded there was no mention of a weapon being displayed by Luis on the night of the shooting.

Kader agreed that the phone extraction showed there were angry texts between Luis and Randy and between Barbara and Randy on the night of the shooting, including a text from Randy to Barbara stating, "Ok only wanna act tuff when my kids are around[.]" Kader further agreed that the text messages reflect that Randy had told the others not to come to his house on the night of the shooting; however, Kader also testified that his investigation showed "no indication there was an imminent fear of serious bodily injury or death at that time[]" by Randy and "[t]here was no indication" a pistol was ever seen near the victim. Kader agreed that he later learned that Luis had provoked Randy verbally on the night of the shooting.

Testimony of Rebekah Lloyd

Rebekah Lloyd testified that she works in the Trace Evidence Section for the DPS Crime Lab in Austin where she and Mike Martinez analyze GSR evidence. According to Lloyd, analyses of swabs taken from people or clothing is helpful "to associate someone" with "gunshot primer residue particles[,]" but GSR analysis cannot tell whether a person was a victim or a witness.

Lloyd agreed she was asked to analyze GSR swabs in this case. According to Lloyd's report, her analyses of GSR swabs detected no GSR particles in the swabs from Randy or Barbara, and it is normally DPS policy not to perform GSR analyses on samples from people who have been shot. Lloyd testified that she analyzed GSR samples from Luis Ortiz, and "[n]o gunshot primer residue particles were detected[]" from the sample from Ortiz's hands, but GSR particles were confirmed from samples from Ortiz's jeans and belt from which she concluded there was a possibility that Ortiz was in the presence of a firearm when it was discharged.

Testimony of Ashley Kibbe

Ashley Kibbe testified that she is a forensic scientist in the DNA section at the DPS Crime Lab in Houston and she was assigned to work on this case. Kibbe testified that she tested DNA samples obtained from a Glock 23 and an H&K VP40 and compared those samples to reference DNA samples from Charlie, Barbara, Randy, Luis, and Michael Doyle.[2] Kibbe testified that her report states that the DNA swab from the Glock 23 is interpreted as a mixture of two individuals, the likelihood ratio obtained indicates that Randy Estrada is a possible contributor to the profile, and Luis Ortiz and Michael Doyle were excluded as contributors. Kibbe further testified that her report states that the DNA swab from the H&K VP40 is interpreted

---

[2] The appellate record reflects that Deputy Doyle was on the scene the night of the shooting, he gave Charlie hand sanitizer to clean his hands, and he secured a firearm at the scene.

as a mixture of two individuals, and the likelihood ratio indicates that Luis Ortiz is a possible contributor to the profile, but Randy and Michael Doyle were excluded as contributors. Kibbe also testified that, as a result of her analysis, Barbara and Charlie were excluded as contributors to the DNA profile obtained from the Glock, Barbara was excluded as a contributor to the DNA profile obtained from the H&K VP40, and Charlie was a possible contributor to the profile from the H&K VP40.

On cross-examination, Kibbe agreed that her analyses do not allow her to conclude how a DNA sample got onto an object. She also agreed that just because someone touches an object does not mean they will leave DNA on the object. She testified that Luis Ortiz was included as a possible contributor to the DNA sample on the H&K "with caution[.]"

Testimony of Barbara

Barbara testified that she works for K&K Earth Works, which Charlie owns. According to Barbara, several of her family members work there. Barbara has four sons and one daughter, Randy is the father of three of her sons, her daughter's father is Luis, and Randy raised all four boys. Barbara recalled that she had known Randy for about twenty years, since she was a teenager. According to Barbara, she and Randy were together for about ten years, but she and Randy had not been living together for about eight months when the shooting occurred.

13

Barbara testified that she met Luis through his work at K&K Earth Works. According to Barbara, she and Luis dated for about two years, and she was dating Luis while she was still living with Randy. Barbara testified that, on the night of the shooting, she was three months pregnant, and both Luis and Randy knew she was pregnant. Barbara testified that Luis did not have a firearm, and she had never seen Luis with a firearm. Barbara testified that she had known Charlie all her life, they had a "brother/sister" relationship, but they also had an on-and-off again sexual relationship.

Barbara testified that for several months before the shooting, she and Randy were always arguing. Barbara recalled arguing with Randy about him having a firearm out in front of the children and arguing about money. She also recalled arguments between Luis and Randy over "dumb stuff[]" such as Randy showing up at Luis's home. Barbara testified that on one occasion, Luis threw a punch at Randy, but the fight only lasted a few seconds. Barbara recalled that Randy and Luis bickered after that incident.

On the night of the shooting, she went to eat at a restaurant with Luis, Charlie, and a young girl, Mary, who was a family friend. While they were at the restaurant, Barbara's son Sam called her, he was crying, and he wanted Barbara to come get him. Sam was about five years old at the time. She told Luis and Charlie that she was going to Randy's house, and Luis and Charlie also went with her to Randy's.

14

Barbara also talked to Randy and told him she was coming to get the children, and Randy told her not to come and to leave the children with him. Barbara then told Randy that she, Charlie, Luis, and Mary were coming over. According to Barbara, she told Randy, "we would fight[,]" but she testified that "my fighting is arguing." Barbara did not recall telling Randy she would "kick his ass" that night, but she agreed she had previously told him she would do so.

Barbara testified that she pulled into Randy's driveway, Charlie and Luis parked their trucks on the street, and she went into Randy's house to get Sam. Barbara recalled she was angry, she agreed she was "a bitch" that night, and she and Randy argued about her taking the children. She also told Randy that Charlie and Luis were waiting outside. Barbara recalled that, at that time, Randy was working for K&K, and Randy also believed that Charlie owed him money. Barbara testified that she told Randy that Charlie was outside if he wanted to talk to him about the money, and Randy went outside.

Barbara recalled that she followed Randy outside, she and Randy were on the porch, Charlie was standing "below the porch[,]" and Luis was in the yard. Barbara testified that her children were "[b]ehind the door and at the window[,]" and she told them to close the door. Barbara let Randy and Charlie talk about the money issue for about five minutes, at which point Randy told Charlie to move over. Barbara recalled that Charlie moved over to the trampoline and Randy pulled out his gun, and Charlie

15

told Randy to take his hands out of his pocket. Barbara testified that Randy then reached into his pocket and started shooting. According to Barbara, Luis had not said anything to Randy, and he was just listening. Barbara testified that she started fighting Randy for the gun, Randy jumped off the porch, Randy ran to Luis and "[s]tood right over him. He unloaded the gun. I don't know how many shots, [] but he just did it until it didn't click [any] more."

Barbara testified that she and Randy went inside, and both Randy and Barbara called 911. Barbara identified State's Exhibit 3 as her 911 call, and the exhibit was admitted and published to the jury. Therein, Barbara tells the dispatcher that someone had been "shot multiple times." Barbara testified that the police arrived while Charlie was giving CPR to Luis. Barbara testified that she did not see Luis with a gun that day, and she did not recall anybody threatening someone's life with their words although she remembered Luis saying something like, "Let's fight like men."

On cross-examination Barbara testified that, one time in 2020, when Randy was coming over to pick up the children, Luis swung at Randy, and Randy swung back, but "they ended up hugging." According to Barbara, other than that incident, there were no other physical altercations between the two men. She agreed that she had an intimate relationship with Charlie during the time that she was in a relationship with Luis and for a while after she and Randy separated but when she

16

was still living at Randy's house. Barbara agreed that she told Randy many times that Luis was going to "beat his ass[.]"

Barbara testified that on the night of the incident, Randy told her, "You are not going to take the kids." She also agreed the text messages reflected that Randy had texted her, "You better not come over here[.]" When she arrived at Randy's house that night, she went to the bedroom and told Randy she was taking the kids and that Charlie was waiting to talk to him. At some point, she heard Randy walk through the kitchen to the front porch, and she stayed in the bedroom with the children, and after a couple of minutes, she walked outside, and the children were still in the bedroom. Barbara recalled that, when Randy was on the front porch, he told Charlie and Luis, "y'all come up here[,]" and they came up to the porch. According to Barbara, while Randy and Charlie talked, Luis did not say anything. Barbara testified that she did not know why Randy was carrying a firearm, and it could not have been based on Luis assaulting him. Barbara did not remember jumping onto Randy's back that night, but she did remember fighting with him for the gun. According to Barbara, Randy kept "firing however many gunshots that gun had until there was no firing in it[,]" and then Randy walked inside and called 911. Barbara recalled that the kids were inside.

An audio recording of the statement Barbara made in Detective Kader's vehicle on the night of the shooting was admitted as State's Exhibit 141. In the

17

recording, Barbara tells Kader that she did not think the children heard or saw anything because they were playing PlayStation in a back room. She tells Kader that Randy had been angry for a few days because she told him she wanted a restraining order, and he would not be able to carry a gun. Barbara tells Kader that Luis told Randy, "if you want to fight, let's fight." Barbara tells Kader that Randy fired "a lot[]" of shots, "the whole gun[,]" and continued to shoot even after Luis was lying on the ground. And Barbara tells Kader that Luis had no weapons of any kind that night, and that she saw that Charlie had a gun when he started CPR on Luis.

Testimony of Dr. Sarah Doyle

Dr. Sarah Doyle testified that she is a pathologist at the Montgomery County Forensic Services Department. She agreed she conducted an autopsy on Luis Ortiz on December 19, 2020. She testified that she found five distinct gunshot wounds on Ortiz at the following sites: (1) left chest, (2) head, (3) right thigh, (4) upper left back, and (5) right hand. Dr. Doyle concluded that the cause of death was multiple gunshot wounds, and the manner of death was homicide. According to the doctor, the wound to Ortiz's chest would not have been survivable, and the wound to Ortiz's head could potentially have been fatal. Doyle testified that a pocketknife was found in Ortiz's pocket. Doyle agreed she collected GSR from Ortiz's hands and packaged it as evidence.

Witnesses for the Defense

Testimony of Don

Don testified that he had known Charlie since he was in grade school and that Charlie had gone to school with Don's daughter. Don testified that, based on his knowledge of Charlie, he found Charlie's reputation for truth and veracity "very poor[,]" and he regarded Charlie as having no reputation for fair dealing. On cross-examination, Don testified that he was not present at the incident on the night of the shooting.

Testimony of Jack

Jack testified that he had known Randy for about sixteen years, and he also knows Barbara, Charlie, and Luis. Jack agreed he had personal experience with Luis being aggressive with him, and he testified that one day at work, Jack said that some other workers were complaining, Jack called them "crybabies[,]" and Luis took off his jewelry to get physical and fight Jack. According to Jack, Luis "was the aggressor in the situation." Jack testified that he had seen another instance of Luis being physically violent with others and had heard of other occasions. Jack testified that Charlie's reputation for honesty was "negative[]" and "very bad." Jack testified that Barbara's reputation for honesty was "[p]robably 50/50." On cross-examination, Jack testified that, in the incident where Jack called other workers "crybabies," Luis did not have a weapon, such as a gun or knife, and ultimately, they did not fight.

19

<u>Testimony of Justin Campbell</u>

Justin Campbell testified that he was working for the Montgomery County Sheriff's Office on December 18, 2020, and he was one of the officers who responded to the shooting. Campbell testified that Randy was inside the house when he arrived, Campbell took him into custody, and they went to Campbell's patrol vehicle, where Randy made a statement. Based on his discussion with Randy that night, he recalled that Randy told him Luis had reached around his back for a weapon.

On cross-examination, Campbell testified that, at the time of trial, he was working in construction. He agreed that on the night of the shooting, he had basic crime scene training, but he was not trained as a crime scene investigator. Campbell testified that he had reviewed the dash camera video from his patrol vehicle from that night, and he recalled Randy saying that he "saw Luis reach around his back like he was going for a weapon." Campbell also stated "[t]hat's what I remembered in my head at the time [he wrote his report], and [] it's not what's on the video." State's Exhibit 142, a recording from Campbell's in-car camera, was admitted into evidence and published to the jury during the defense's case-in-chief.

<u>Testimony of Donna</u>

Donna testified that she worked as an administrative assistant with the Montgomery County Justice of the Peace office and that Barbara's oldest son is her

cousin's son. Donna recalled that Randy came to see her on December 18, 2020, and he appeared "stressed, upset, [and] worried." According to Donna, Randy showed her and the bailiff some text messages that day, she told him to keep them for his records, and she gave him the name of a lawyer. On cross-examination, Donna agreed that when Randy visited her that day, he could have walked across the hall to the Constable's Office.

Testimony of Michael Burnett

Michael Burnett testified that he worked for the Montgomery County Sheriff's Office, and he was an investigator assisting Detective Kader in this case. He recalled talking with Randy about whether Randy might have a self-defense argument. On cross-examination, Burnett testified he was still "100 percent[]" confident in his decision to charge Randy with murder.

Testimony of Michael Doyle

Michael Doyle testified that he was employed with the Montgomery County Sheriff's Department in December of 2020, when he was called to the scene of a gunshot incident. Doyle recalled that Charlie said he had a gun in his vehicle, and Doyle asked Charlie for the gun that Charlie had in his car. Doyle agreed that the video depicts him telling Charlie, "make sure I get your cell phone[,]" but Doyle testified that he did not get Charlie's cell phone that night. Doyle agreed that when he took Charlie's gun that night, Doyle was not wearing gloves, and that was a

21

mistake. He also agreed it was a mistake to allow Charlie to wipe his hands at the scene.

Doyle identified Exhibit 147 as a video recording from the dash camera in his patrol vehicle from the night of the shooting, and the exhibit was published to the jury. In the recording, someone is heard saying, "Whatever you do, be sure you don't forget your cell phone [] before you leave." Charlie is heard saying that his gun was in his truck and that he never fired it.

Testimony of Eric Devlin

Eric Devlin testified that he is the Managing Director of the Lone State Digital Forensic Group—a forensic company based in Houston—and he was previously a prosecutor at the Harris County District Attorney's Office. He agreed he was provided copies of extractions in this case for the cell phones of Luis, Barbara, Sam, and Randy. Devlin testified that he was concerned that the extraction Detective Kader performed was "the shallowest form of [] forensic extraction you can do," and Devlin prefers to start with the deepest extraction possible and proceed to the shallowest. Devlin also prefers to do all levels of extraction at the same time and then return the phone, but he explained that if he has obtained the phone by consent of the owner, there is not always the option to keep the phone long enough to perform all extractions. Devlin testified that, in his opinion, the police should have kept any phone for which they had not performed "the deepest possible extraction available."

22

According to Devlin, the Cellebrite software is "the gold standard when it comes to cell phone forensics[,]" although he testified it offers "limited recovery" because it performs only a logical extraction. According to Devlin, only a logical extraction was performed on Luis's phone. Devlin did not recall any issues with the extraction performed on Barbara's phone. Devlin recalled that Randy's phone was the only one in this case where the extractions went farther than "Level 1" or the logical extraction. On cross-examination, Devlin agreed that a full extraction was performed on the defendant's phone.

Testimony of Charlie

Testifying for the defense, Charlie read from Defense Exhibit 1, a printout of texts from Barbara's phone between him and Barbara from November 29 through December 1, 2020. He agreed he had texted Barbara, "I love you[,]" and he did not know whether he sent that text while Barbara was in a relationship with Luis. Charlie agreed that he and Barbara rented a hotel room on occasion, and one of the texts from Barbara read, "Randy got told I rented a room." Another text read, "Randy is a goner." Charlie agreed that he knew that Barbara was in a relationship with someone else. Charlie testified that the "original reason" he went to Randy's house on December 18th was to pick up Sam, but another reason was "in case either one of [Luis or Randy] was to fight for some reason[,] to stop it[,]" but he said that they

23

were "never there to fight." Charlie testified that he never heard Luis say, "Come down and fight me[.]"

On cross-examination, State's Exhibit 144 was admitted and published to the jury, which the State described as the audio statement Charlie made to Detective Kader on the night of the shooting. In his statement, Charlie told the officer that he went to Randy's house with Barbara and Luis that night because Sam had called Barbara and said he had "something bad" to tell her and he wanted to go home. Charlie said that Randy invited him and Luis to approach the house, and although there was some "tension," there was no yelling, cursing, or violent words. In the audio recording, Charlie states that Barbara stayed on the porch holding Sam's hand, Charlie did not know that Randy had a gun, and Randy kept his hands in his pockets. Charlie can also be heard telling Kader that at some point, Randy said something "stern" to Luis and instantly pulled out his gun, shot Luis three or four times, then went over to Luis and continued to shoot him while Luis lay on the ground. At the end of his statement, Charlie told Kader that Randy had been telling Barbara he was going to give her the house "right around Christmas" and "I'm not going to be here for you to worry about it[,]" and Charlie had personally heard Randy tell Barbara that Randy would give Barbara the house "by Christmastime."

24

<u>Testimony of Michael Martinez</u>

Michael Martinez testified that he is a forensic scientist and he was asked to testify regarding GSR. Martinez commented on the report produced by Rebekah Lloyd concerning Luis Ortiz's clothing that stated, "In cases in which clothing are analyzed outside of laboratory policy, no interpretation will be drawn[,]" and Martinez testified that the statement was disingenuous and ambiguous because particles were found but no conclusion was offered. He also had concerns about the testing laboratory's "unwritten policies," which are "frowned upon[]" and "arbitrary[.]" According to Martinez, although Rebekah Lloyd's testimony indicated that particles were detected on the sample from Barbara but were excluded because they contained iron, zirconium, and manganese, according to the American Society of Testing and Materials, the presence of these elements "is not a necessary concern for exclusion of a characteristic particle." Martinez testified that Lloyd found GSR particles on the rear waistband of Luis Ortiz's pants, which Martinez regarded as consistent with someone tucking a gun they had recently fired into their waistband. Martinez further testified that it is generally accepted that GSR particles may transfer from one surface to another.

Martinez testified that no shot distance determination was performed in this case and that this case was a "classic case for performing distance determination."

25

In his opinion, Ortiz's clothing that was taken into evidence could have been analyzed for distance determination.

Testimony of Lisa

Lisa testified that she is married to Eddie, who is Barbara's brother, and Randy is her brother-in-law. She testified that on the day of the shooting, Randy was visiting her home, they went out, where they saw Barbara and Jack, and Barbara followed them when they went home. According to Lisa, Barbara was angry, and Barbara threatened Randy he better "watch his back" because Luis was going to come after him.

Testimony of Detective Jeremy Kader

A video recording of Randy's statement to Detective Kader was published to the jury as State's Exhibit 146. The recording depicts Randy saying that although he knew Charlie and Luis carried guns, he did not see a gun on the night of the shooting. Randy also told the Detective that he told Donna that he had been getting threats. In his statement, Randy said he pulled his gun out when Charlie stepped back and Luis moved his hands and that he "didn't give [Luis] a chance" because Randy had already been threatened. Randy agreed that no one pointed a gun at him that night. He also told Kader that he did not think the children saw what happened because they were in the house watching TV and playing games.

26

The defense rested, and the case was submitted to the jury. The jury returned a verdict finding the defendant guilty of murder. After a hearing on punishment, the jury found that the defendant did not act under the immediate influence of sudden passion arising from an adequate cause and assessed punishment at twelve years of imprisonment. Estrada timely filed a notice of appeal.

## Issues

Appellant states two issues on appeal. In his first issue, Appellant argues that the trial court erred by denying his request for a jury instruction on defense of third persons. In his second issue, Appellant argues that the trial court erred by conducting a hearing outside the presence of the jury and outside the presence of defense counsel to determine whether an empaneled juror was biased.

## Jury Charge

Appellant argues that the trial court erred by denying his request for a jury charge on defense of third person, that he suffered some harm as a result, and that his conviction should be reversed. According to Appellant, "[t]he evidence showed that Appellant['s] children were right behind him on the front deck of the home" when Ortiz called him out.

We review a claim of alleged jury charge error using a two-step process in which we examine (1) whether error existed in the charge and (2) whether sufficient harm resulted from the error to require reversal. *Ngo v. State*, 175 S.W.3d 738, 743-

44 (Tex. Crim. App. 2005) (en banc). Where, as here, the defendant properly objected to the charge at trial, jury charge error requires reversal if we find "some harm" to his rights. *See id.* at 743 (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). The *Almanza* standard requires that an appellant show actual, and not theoretical, harm from jury instruction error. *Id.* at 750; *see also Cornet v. State*, 417 S.W.3d 446, 449 (Tex. Crim. App. 2013).

Trial courts are required to instruct the jury on the law applicable to the case. *Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021). "Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Id.* In reviewing whether the trial court erred in refusing to submit a requested defensive instruction, we examine the evidence offered in support of the defensive issue in the light most favorable to the defense. *Id.* A trial court errs by refusing a defense of third person instruction if there is some evidence, viewed in the light most favorable to the defendant, that will support its elements. *Id.*

A defendant is justified in defending a third person if, under the circumstances as the defendant reasonably believes them to be, the third person would be justified

in defending himself. *Morales v. State*, 357 S.W.3d 1, 4 (Tex. Crim. App. 2011) (citing Tex. Penal Code Ann. § 9.33; *Hughes v. State*, 719 S.W.2d 560, 564 (Tex. Crim. App. 1986)). The self-defense statute provides that deadly force is justified if, among other things, the actor "reasonably believes the deadly force is immediately necessary . . . to protect [himself] against the other's use or attempted use of unlawful deadly force[.]" Tex. Penal Code Ann. § 9.32(a)(2)(A); *Morales*, 357 S.W.3d at 4. The defendant must reasonably believe that his intervention and use of deadly force is "*immediately* necessary to protect the third person[.]" *See Hughes*, 719 S.W.2d at 564 (emphasis in original). When there is no evidence that the victim was making an attack or threatening an immediate attack upon a third party, the issue of defense of third person is not raised. *See Brooks v. State*, 548 S.W.2d 680, 684 (Tex. Crim. App. 1977), *disapproved of on other grounds by Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984) (en banc); *Constancio v. State*, 643 S.W.2d 153, 156 (Tex. App.—Austin 1982, no pet.); *see also Valdez v. State*, No. 14-22-00555-CR, 2024 Tex. App. LEXIS 829, at *11 (Tex. App.—Houston [14th Dist.] Feb. 1, 2024, no pet.) (mem. op., not designated for publication).

In his recorded statement, Randy told Detective Kader that, during the incident, the children were inside watching TV and playing games. Although Charlie told Kader that Barbara was standing on the porch with the children, in Sergeant Polansky's body camera video, Barbara is heard telling the Sergeant that all her

29

children are inside. Barbara testified that her children were indoors during the confrontation between Randy, Luis, and Charlie. In the audio recording from the camera in Detective Kader's vehicle, Barbara says that she did not think the children heard or saw anything because they were playing PlayStation in a back room. The recording from Sergeant Polansky's body camera depicts the officers entering the home after the shooting and finding the children in a back bedroom.

In his recorded statement to Detective Kader, Randy stated that no one pointed a gun at him that night but there were verbal threats. Charlie testified that he did not see a gun on Luis Ortiz when he rolled him onto his back after the shooting and that neither Charlie nor Luis threatened Randy with deadly force that night. Charlie stated his gun remained in his truck until after the shooting, and Patricia Bui testified that none of the fired cartridges at the scene identified back to Charlie's gun. In his recorded statement to Detective Kader on the night of the shooting, Charlie stated that, although there was tension that night, there was no yelling, cursing, or violent words. In the recording from Kader's in-vehicle camera, Barbara is heard saying that Luis had no weapons of any kind that night.

Viewed in the light most favorable to Appellant, we conclude that the evidence does not raise the issue that Appellant reasonably believed his intervention with deadly force was immediately necessary to protect third persons. *See* Tex. Penal Code Ann. §§ 9.32(a)(2)(A), 9.33; *Brooks*, 548 S.W.2d at 684 (because there was

30

no evidence that the deceased was attacking or threatening immediate attack upon a third person, evidence could not have led defendant to reasonably believe his intervention was immediately necessary to protect the third person); *Valdez*, 2024 Tex. App. LEXIS 829, at *12 (jury instruction on defense of third persons not required where there was no evidence that the victims attacked or made any threats to harm defendant's family members so as to require immediate protection); *Constancio*, 643 S.W.2d at 156 ("Where there is no evidence that the deceased was making an attack or threatening an immediate attack upon a third party but was directed only toward appellant, the issue of defense of third parties is not raised."). Because we conclude that the trial court did not err by denying the requested instruction, we need not examine whether Appellant was harmed. *See Ngo*, 175 S.W.3d at 743-44.[3] We overrule Appellant's first issue.

---

[3] The jury charge included an instruction on self-defense. By rendering a guilty verdict, the jury implicitly rejected Appellant's claim of self-defense, so that any error in denying a charge on defense of third person based on the same evidence was harmless. *See Sponable v. State*, No. 04-17-00817-CR, 2018 Tex. App. LEXIS 10816, at *21 (Tex. App.—San Antonio Dec. 27, 2018, no pet.) (mem. op., not designated for publication) (concluding that jury's rejection of self-defense "precludes the possibility that a rational jury would have nevertheless concluded his actions were justified to protect his daughter[]"); *Evans v. State*, 945 S.W.2d 153, 158 (Tex. App.—El Paso 1997, no pet.) (negative jury finding on self-defense precluded the possibility that appellant was justified in using deadly force to defend a third person); *Hernandez v. State*, 914 S.W.2d 218, 224 (Tex. App.—El Paso 1996, pet. ref'd) ("[B]ecause the jury considered and rejected Hernandez's claim of self-defense, any error in failing to charge the jury on defense of a third person was harmless.").

Communication with a Juror

In his second issue, Appellant argues that the trial court erred by questioning a juror outside the presence of the jury and outside the presence of counsel to determine whether that juror was actually biased. According to Appellant, when there is an allegation that a juror is biased, the remedy is a hearing during which the defendant has the opportunity to prove actual bias, and Appellant cites *Smith v. Phillips*, 455 U.S. 209, 215 (1982). Appellant argues that "[b]ecause the proper procedure for conducting a hearing regarding whether an empaneled Juror is actually biased, namely allowing defense counsel to question the juror, was not followed, Appellant was denied a fair and impartial jury." Appellant further argues that "it was incumbent on the trial court to allow defense counsel to explore the issue of bias with the juror." According to Appellant, when a juror withholds material information during voir dire, the parties are denied the opportunity to exercise their challenges, which is a violation of a defendant's Sixth Amendment right to an impartial jury, citing *Franklin v. State*, 138 S.W.3d 351, 355-56 (Tex. Crim. App. 2004).

During the trial, after the State rested and the defense had questioned two witnesses, the trial court announced that the bailiff had received a note from Juror No. 10 that states, "Does it matter if I know a witness?" The State recommended that the trial court speak with the juror to determine the nature of the relationship between the juror and the witness. The trial court asked the defense whether it objected to the

court making an inquiry "in-camera" into whether the juror was impartial, and the defense objected. Defense counsel suggested that the court tell the jury that it was sworn to uphold the oath of the jury. After some discussion at the bench, defense counsel stated, "We object under the client's right [under the] Sixth Amendment[,]" and the State maintained that an inquiry was necessary. Defense counsel told the trial court that, in an unrelated previous trial, "an inquiry was made to a jury that resulted in a mistrial after a week-long trial[,]" and the trial court stated that it would not make an inquiry of Juror No. 10 unless counsel for the State identified precedent that required the court to do so.

The trial resumed, and after the defense had rested its case, the State offered case law supporting the trial court making an inquiry of Juror No. 10, and the defense continued to object. The trial judge expressly suggested to the defense that the trial court could hold a hearing outside the presence of the jury on the issue, but the defense objected to a hearing. Thereafter, the following exchange occurred:

The Court: [Defense counsel], what do you say as to [certain cases] - -

[Defense counsel]: I have read them, and I say we oppose.

The Court: What is your opinion as to those three cases?

[Defense counsel]: That they don't apply to our situation.

The Court: So, you still believe a hearing should not be held as to the issue of actual bias?

[Defense counsel]: Yes, ma'am.

33

The Court: Okay. And also disagreeing with the Supreme Court Case, Smith v. Phillips?

[Defense counsel]: Yes.

The Court: Okay. And furthermore, if the withheld information has a tendency to show bias, the trial court should hold a hearing whether the juror is actually bias[ed]. You disagree with that, as well?

[Defense counsel]: Yes.

The Court: If the withheld information has a tendency to show bias, an appropriate procedure is to hold a hearing at which evidence should be [e]duced regarding whether the juror is actually bias[ed].
The Defense disagrees with that contention, as well?

[Defense counsel]: Yes, ma'am.

The Court: All right. Has the Defense brought forth any cases on this issue that if the Court were to conduct that one-on-one inquiry with that juror, that it would be shown as to a reversal or the standard needed for a reversal? I have found nothing.

[Defense counsel]: Not on this issue.

The trial court then made an inquiry of Juror No. 10, outside the presence of the jury and counsel, with the bailiff present, and on the record. The trial court asked whether the juror's relationship with or knowledge of the witness has caused the juror to be biased, and the juror replied that it had not.

The jury charge included the following instructions:

You must not consider or mention any personal knowledge or information you may have about any fact or person connected with this case that is not evidence in the trial.
. . . .

34

You are to render a fair and impartial verdict based on the evidence admitted in the case under the law that is in these instructions.

After the jury returned its verdict, the defense filed a Motion for New Trial that argued, in relevant part,

When the Court made an inquiry just prior to jury deliberation as to whether the juror was disabled, this was an error by the Judge, as this juror gave no indication of potential disability. After the Court's inquiry, and despite multiple objections from Defense Counsel, it was affirmed that this juror was not a disabled juror.

However, the most egregious mishap in this interaction between Judge and Juror, was the fact that either a.) the Judge provided no instruction to the Juror to keep to himself the subject matter and details of the Judge's inquiry (See Juror's Sworn Affidavit, Exhibit A) OR, b.) if the Court Record shows that the Judge did in fact provide instructions to the Juror to not discuss the reason for inquiry or what was discussed, according to his Sworn Affidavit (Exhibit A), this Juror did in fact provide those details to the Jury Panel, which would be misconduct by the Juror.

Juror No. 10's affidavit stated that he had known one of the witnesses about twenty years prior. The affidavit further stated, in relevant part,

"Right before we went to deliberate on Guilt or Innocence, the Judge spoke with me about my relationship with or connection to the Defense witness I recognized. I did tell [the trial court] that it would not hinder me in anyway of doing my duty as a juror.

"I do not recall her instructing me to not discuss our conversation with the other jurors.

"After I spoke to the Judge, later in the jury room, one of the other Jurors said 'I didn't think you were coming back. I think I shrugged my shoulders and said 'I wasn't either.'

35

"During deliberations I did tell the other jurors the reason I was called out but we had no real discussion and the identity of the witness was not directly revealed.

On appeal, the State argues that Appellant failed to preserve error on this issue because his objection at trial does not comport with the issue raised on appeal. We agree. To preserve error for appeal, "the objecting party must still 'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'" *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). "The point of error on appeal must comport with the objection made at trial." *Id.* (citing *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Crim. App. 1986); *see also Ford v. State*, 488 S.W.3d 350, 351 (Tex. App.—Beaumont 2016, no pet.). Even constitutional rights may be waived by a failure to "object, move for relief, or ask the trial court for relief before complaining about the alleged error in a later appeal." *Sartin v. State*, 680 S.W.3d 663, 667-68 (Tex. App.—Beaumont 2023, no pet.).

In this case, defense counsel took the position at trial that *no* inquiry of Juror No. 10 should be made and that no hearing on the issue should be held by the trial court to determine whether the juror was biased. However, on appeal Appellant argues that the defense should have been permitted to examine Juror No. 10 at a hearing for potential bias in a hearing. We conclude that Appellant waived the issue he argues on appeal because his objection and argument on appeal do not comport

with his objection and argument at trial. *See* Tex. R. App. P. 33.1; *Clark*, 365 S.W.3d at 339; *Sartin*, 680 S.W.3d at 667-68; *Ford*, 488 S.W.3d at 351.

But even assuming his objection had been preserved, we find no error. When a juror has not withheld information during voir dire and later recognizes a witness, the Sixth Amendment does not require that counsel be permitted to question the juror. As the Twelfth Court has explained,

> Appellant acknowledges that there is no evidence that the juror withheld information about her familial relationship to [a witness] during voir dire, however, he relies on *Franklin v. State* to argue that "it was incumbent on the trial court to allow defense counsel to explore the issue with the juror." 138 S.W.3d 351, 356 (Tex. Crim. App. 2004). In *Franklin*, the [C]ourt of [C]riminal [A]ppeals applied the constitutional harm standard to a trial court's denial of a mistrial based on a juror's withholding of material information. *Id.* at 354-57. After the trial had begun, a juror alerted the trial court that she knew the victim. *Id.* at 352. The trial court denied defense counsel's motion for mistrial, and further denied his request to question the juror to develop the record on the juror's potential bias. *Id.* The [C]ourt of [C]riminal [A]ppeals held that the juror's withholding of information, the judge's denial of a mistrial, and the judge's refusal to allow defense counsel to question the juror adversely affected the appellant's right to a fair and impartial trial. *Id.* at 357.
>
> Appellant's reliance on *Franklin* is misplaced. Because Appellant's trial counsel made no attempt during voir dire to ask the venire[] whether they knew any potential witnesses, despite trial counsel knowing the witnesses' identities, the juror never withheld any information. *See Armstrong v. State*, 897 S.W.2d 361, 363-64 (Tex. Crim. App. 1995). Thus, Appellant argues that he has a constitutional right to ask jurors additional questions after the start of trial if the need arises. This proposition was specifically dispelled by the court in *Franklin*. 138 S.W.3d at 358 ("But we do not hold here that *Franklin* had a constitutional right to ask the juror additional questions during trial.")

Appellant offers no other authority, nor are we aware of any, that requires a trial court to allow a defendant to question a juror, after the start of trial, about matters he could have questioned the juror about during his voir dire examination.

*Fulton v. State*, 576 S.W.3d 905, 923 (Tex. App.—Tyler 2019, pet. ref'd). In this case there was no evidence that Juror No. 10 withheld information, nor does Appellant provide any citations to the record to support its argument that the juror withheld information. *See* Tex. R. App. P. 38.1(i) (requiring appellate briefs to cite to the record and to applicable authority). Neither was there any evidence that counsel asked the venire whether they knew any potential witnesses. Therefore, we find Appellant's argument unavailing, and we overrule Appellant's second issue.

Having overruled both of Appellant's issues, we affirm the trial court's judgment of conviction.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on December 27, 2024
Opinion Delivered April 9, 2025
Do Not Publish

Before Johnson, Wright and Chambers, JJ.